Karen SHOOK, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA FINANCIAL RESPONSIBILITY AND MANAGEMENT ASSISTANCE AUTHORITY, Defendant.

Civ.A. No. 96–2601 (GK).

United States District Court, District of Columbia.

April 30, 1997.

Barbara S. Wahl, Jeanine A. Worden, Evan S. Stolove, Arent, Fox, Kitner, Plotkin & Kahn, Washington, DC, Ronald C. Jessamy, Joanne Doddy Fort, Jessamy, Fort & Botts, Washington, DC, for Plaintiffs.

Daniel Reznick, D.C. Financial Responsibility and Management Assisitance Authority, Washington, DC, for Defendant.

*MEMORANDUM OPINION*

KESSLER, District Judge.

This matter is before the Court on Defendant's Motion to Dismiss [# 10] and Plaintiffs' Motion for Summary Judgment [# 11]. Plaintiffs, members of the District of Columbia Board of Education, brought this action in their official and individual capacities.

This case presents enormously significant issues concerning the statutory relationship and structural tensions between the District of Columbia Financial Responsibility and Management Assistance Authority (commonly referred to as the "Control Board"), created and appointed by Congress in 1995, and the Board of Education, which Congress created in 1906 as an appointive body but subsequently modified, in 1968, to be a body elected by the voters of the District of Columbia. While understandable concerns about preservation of Home Rule[1] permeate Plaintiffs' pleadings, the legal question before the Court is a good deal narrower than the parties' rhetoric would suggest. Put simply, the question is whether the Control Board had the authority—both statutory and constitutional—to issue its Order of November 15, 1996. For all the reasons set forth herein, the Court concludes that the answer is "yes".

Plaintiffs initially requested that the Court issue a Temporary Restraining Order enjoining the Control Board from taking any action affecting the structure or responsibilities of the Board of Education. After a hearing on November 15, 1996, the Court denied Plaintiffs' Motion for Temporary Restraining Order. The Parties agreed to consolidate the hearing on Plaintiffs' Motion for Preliminary Injunction with a hearing on the merits pursuant to Fed. P. Civ. P. 65(a)(2). An expedited briefing schedule was set pursuant to section 105(d) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub.L. 104–8,

D.C.Code § 47–291.5(d). Several Washington, D.C.–based organizations[2] filed an *amicus* brief in support of Plaintiffs' Motion.

The Court has considered the parties' Motions, the *amicus* brief, the Oppositions thereto, the Replies, the supplemental memoranda submitted by Defendant, and the excellent oral arguments presented by counsel on February 14, 1997. For the reasons discussed below, Defendant's Motion to Dismiss [# 10] is **granted** and Plaintiffs' Motion for Summary Judgment [# 11] is **denied.**

**I. Background**

In April 1995, in response to the District's well-documented continuing fiscal crisis, Congress established the Control Board. District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub.L. 104–8, 109 Stat. 97 ("FRMAA"). In section 2 of FRMAA, labeled "Findings; Purpose", Congress laid out the significant problems that faced the District because of "accumulated operating deficits, cash shortages, management inefficiencies, and deficit spending". FRMAA § 2(a)(1). Congress also recognized that "the District of Columbia government fails to provide its citizens with effective and efficient services in areas such as education, health care, crime prevention, trash collection, drug abuse treatment and prevention, human services delivery, and the supervision and training of government personnel". *Id.* § 2(a)(2).

FRMAA gave the Control Board oversight of the financial activities of the District of Columbia government. The only part of the District government explicitly exempted from Control Board authority was the District of Columbia court system. *Id.* § 2(c)(3). FRMAA gave the Control Board sweeping powers with respect to the District's budget, including planning and enforcing a budget,

1. The term "Home Rule" is used loosely and often. While it has no textbook definition, for purposes of this Opinion it will refer to the panoply of federal and local statutes and regulations defining the governance of the District of Columbia.

2. The *amici* are the Missionary Baptist Ministers Conference for Washington D.C. and Vicinity,

the District of Columbia Appleseed Center for Law and Justice, the Coalition for Political and Financial Accountability, the D.C. Statehood Party, Fight for the Life of the City, the DC/MD/NOVA Democratic Socialists of America, the Plymouth Congregation of the United Church of Christ, D.C. PUSH/RAINBOW, National PUSH/RAINBOW, and the Umojaa Party.

*id.* §§ 201–203, approving the District's attempts to borrow funds, *id.* § 204, making recommendations to various District and Federal officials to ensure compliance with the budget and to improve the efficient delivery of services to District residents, *id.* § 207, and issuing bonds, *id.* §§ 211–214.

In September 1996, Congress passed several amendments to FRMAA as part of a general appropriations bill. Act of September 30, 1996, Pub.L. No. 104–208, 111 Stat. 3 (the "FRMAA Amendments"). The FRMAA Amendments gave the Control Board new and expanded powers to issue orders, rules, and regulations. FRMAA Amendment § 5203(f) (enacting FRMAA Section 207(d)(1)), provides that:

> the Authority may at any time issue such orders, rules, or regulations as it considers appropriate to carry out the purposes of this Act and the amendments made by this Act, to the extent that the issuance of such an order, rule, or regulation is within the authority of the Mayor or the head of any department or agency of the District government, and any such order, rule, or regulation shall be legally binding to the same extent as if issued by the Mayor or the head of any such department or agency.

FRMAA § 207(d)(1).

In November 1995, the Control Board issued "Children in Crisis: A Report on the Failure of D.C.'s Public Schools." In more than 50 pages of text and 23 pages of graphs and supporting statistics, the Control Board detailed the deplorable condition of the District's public school system and the quality of education received by District of Columbia children. The Report concluded that the "lack of leadership from the District's elected Board of Education and the Superintendent of Schools" was at the heart of "most of the problems in the school system". Crisis Report at 2.

On November 15, 1996, the Control Board issued a "Resolution, Order and Recommendation Concerning District of Columbia Public School System" (the "November Order").

This was the first action taken by the Control Board pursuant to its powers under FRMAA section 207(d). The November Order established a new body, the Emergency Transitional Education Board of Trustees ("Board of Trustees") and the position of CEO–Superintendent. The Board of Trustees consists of nine members: five appointed by the Control Board; one member selected by the Control Board from a list of three parents of District school children provided by the Mayor; one member selected by the Control Board from a list of three District teachers provided by the City Council; the Chief Executive Officer ("CEO")-Superintendent; and the President of the District of Columbia Board of Education.[3] The initial appointment of the CEO–Superintendent was to be made by the Board of Trustees; all later appointments are to be made by the Board of Trustees with the Control Board's approval. The CEO–Superintendent's duties are coextensive with those of the Superintendent of Schools.

The November Order transferred most of the powers and duties of the Board of Education to the Board of Trustees. Despite Defendant's attempt to characterize the situation differently, the reality is that the November Order gave the Board of Trustees "all the authority, powers, functions, duties, responsibilities, exemptions, and immunities of the Board of Education ... including but not limited to the District of Columbia School Reform Act of 1995."[4] November Order ¶ 6. Further, the Board of Trustees is directed to oversee "all facility planning, construction, improvement, repair, rehabilitation, and maintenance ... with respect to school buildings and grounds." *Id.* ¶ 9. The Board of Trustees also approves the CEO–Superintendent's appointments and proposed annual budget, and may establish procurement and labor policies. *Id.* ¶¶ 10–11, 14–16. The duties delineated as Board of Education responsibilities under the School Reform Act are, in the November Order, assigned jointly

---

**3.** According to the terms of the November Order, the Board of Trustees is to terminate on June 30, 2000, unless its existence is extended by the Control Board. November Order ¶ 18.

**4.** The District of Columbia School Reform Act of 1995, Pub.L. No. 104–134, 110 Stat. 1321, is discussed more fully in Section II of this Opinion.

to the Board of Trustees and the CEO–Superintendent. *Id.* ¶ 13.

The Board of Education, through its President, may cast one vote on the Board of Trustees. Its role under the November Order is limited to providing "input, advice, counsel, guidance, reports and recommendations on general educational policy", all of which are to be given "due and appropriate weight" by the Board of Trustees and the CEO–Superintendent. The Board of Education also retains authority to act as a chartering authority under the School Reform Act of 1995.

Plaintiffs in this case are current and former elected members of the Board of Education who are also registered voters who voted in the November 1996 election to elect members of the Board of Education. Suing in both their official capacities and in their individual capacities as District of Columbia voters, Plaintiffs bring several statutory and constitutional challenges to the Control Board's November Order. Defendant has moved to dismiss Plaintiffs' Amended Complaint and Plaintiffs have moved for summary judgment.

## II. Statutory History

Congress has, and has always had, a special relationship with the District of Columbia. The Constitution grants Congress the authority "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District ... as may ... become the Seat of the Government of the United States...." U.S. Const. art. I, § 8, cl. 17. It is undisputed that Congress' power over the District is plenary, which means that:

> The Congress of the United States, being empowered by the constitution 'to exercise exclusive legislation in all cases whatsoever' over the seat of the national government, has the entire control over the District of Columbia for every purpose of government—national or local. It may exercise within the District all legislative powers that the legislature of a state might exercise within the state....

*Capital Traction Co. v. Hof,* 174 U.S. 1, 5, 19 S.Ct. 580, 582, 43 L.Ed. 873 (1899) (quoted in *Palmore v. United States,* 411 U.S. 389, 397, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973)).

In 1906, Congress exercised its plenary power to create the Board of Education. 1906 Act to Fix and Regulate the Salaries of School Officers and Other Employees of the Board of Education, 34 Stat. 316 (the "1906 Act"). Under the 1906 Act, the Supreme Court of the District of Columbia appointed the members of the Board of Education. The 1906 Act provided that "the control of the public schools of the District of Columbia is hereby vested in a board of education." With respect to the duties of the Board of Education, the 1906 Act provided, *inter alia,* that:

> The board shall determine all questions of general policy relating to the schools, shall appoint the executive officers hereinafter provided for, define their duties, and direct expenditures. All expenditures of public funds for such school purposes shall be made and accounted for as now provided by law under the direction and control of the Commissioners of the District of Columbia. The board shall appoint all teachers in the manner hereinafter prescribed and all other employees provided for in this Act.... the board shall appoint one superintendent ... [and] shall have the power to remove the superintendent at any time for adequate cause affecting his character and efficiency.

*Id.* The control of the budget remained vested in the Commissioners of the District of Columbia, although the Board of Education had discretion to perform its functions within the limitations of that budget.

Congress retained the "control" language of the 1906 Act in subsequent legislation and the functions and role of the Board of Education remained essentially unchanged. In 1968, Congress enacted the District of Columbia Elected Board of Education Act, Pub.L. No. 90–292, 82 Stat. 101, which gave District residents, for the first time, the right to vote for members of the Board of Education. By granting them the right to vote, Congress intended to give District residents a "voice in helping determine educational policies." Sen. Rep. No. 942, 90th Cong., 1st Sess. 1–2 (1968). The 1968 legislation pro-

vided that the Board of Education was to work with the Commissioners of the District of Columbia to improve and coordinate educational and other municipal programs.

The next major piece of legislation affecting the duties and powers of the Board of Education was the 1973 District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (commonly referred to as the "Home Rule Act"). The Home Rule Act covered a number of topics. The Charter of the District of Columbia (the "District Charter") is contained in Title IV of the Home Rule Act. Congress structured the Act in this manner so that it could take certain actions with respect to the existing District of Columbia government, even if District voters did not adopt the District Charter, which would create the future government of the District of Columbia. Home Rule Act § 102(b).

The Home Rule Act abolished certain offices, including the Commissioners of the District of Columbia, transferred their functions to other entities established by the District Charter, and provided for the District's annual federal payment. Id. §§ 501, 502, 711–719. The District Charter established the City Council as the legislative branch of the District of Columbia government, id. §§ 401–404, 411–413, the Mayor as the executive branch, id. §§ 421–423, and the District of Columbia Court of Appeals and the Superior Court of the District of Columbia as the judicial branch, id. §§ 431–434. The District Charter also created five independent, non-executive branch agencies not subject to control by the Mayor or the City Council, including the Board of Education. Id. §§ 491–495. Again, Congress retained the "control" language included in earlier legislation in the provisions of the District Charter that established the Board of Education. The District Charter codified the Board of Education in the same form in which it existed before the Home Rule Act.

In promulgating the Home Rule Act, Congress gave District citizens the power to control various aspects of their government through the electoral process. Id. § 401(a) (election of members of the City Council); id. § 421(a) (election of the mayor); id. § 738(b) (election of Advisory Neighborhood Council members). However, Congress specifically reserved the right to exercise its constitutional plenary power over the District

> by enacting legislation for the District on any subject, whether within or without the scope of legislative power granted to the Council by this Act, including legislation to amend or repeal any law in force in the District prior to or after enactment of this Act and any act passed by the Council.

Home Rule Act § 601, D.C.Code § 1–206. All parties concede that to exercise its reserved power to amend the District Charter and alter the parameters of Home Rule, Congress need not explicitly state in subsequent legislation that it is so doing.

In 1978, the District Charter was amended to give District voters the right to recall elected Board of Education members. D.C. Law 2–46, Charter Amendment No. 2, D.C.Code §§ 1–291, 1–292.

In 1995, Congress passed FRMAA, creating the Control Board and delegating to it broad powers over the District of Columbia, including: approval of the District's financial plan and annual budget, FRMAA §§ 201–202; review of all acts passed by the City Council; id. § 203(a); pre-execution review of collective bargaining contracts and such leases "as the [Control Board] may specify" and post-execution review of all other contracts and leases to ensure compliance with the approved financial plan and annual budget, id. § 203(b); control over the District's borrowing, id. § 204; and control over the annual Federal payment to the District, id. § 205. The Control Board was given ultimate control and responsibility for the District of Columbia's budget and is accountable to Congress. Further, Congress empowered the Control Board to make recommendations to improve the financial stability and management responsibility of the District government. Id. § 207. If the District government fails to adopt a Control Board recommendation, the Control Board, after consultation with the appropriate congressional committees, may adopt and implement the recommendation itself. Id.

As noted earlier, FRMAA specifically identified education as an area in which "the District of Columbia government fails to provide its citizens with effective and efficient services." Id. § 2(a)(2). The conference report accompanying FRMAA set forth Congress' expectations that "the [Control Board] will take such action to improve the management of the District of Columbia Public Schools." H. Rep. No. 104–863, 104th Cong., 2d Sess. at 1183. FRMAA also reduced the Board of Education's power *vis-a-vis* other District of Columbia governmental entities by giving the Mayor and the City Council line-item authority over the public school system budget—a power previously denied to them by Section 452 of the Home Rule Act. *Id.* § 202(g).

In 1996, Congress passed the District of Columbia School Reform Act of 1995 as part of Pub.L. 104–134. That law charged the Superintendent of Schools, in consultation with the Board of Education, the Mayor, the City Council, the Control Board, and the Consensus Commission, with developing a long-term plan for the public schools. The long term plan was to include recommendations affecting nearly every aspect of the District of Columbia's public schools, including, *inter alia,* curriculum, teaching standards, workforce training, adult education, after-school programs, dress codes, and teacher certification. *Id.* § 2101(b). Pursuant to the statute, the long-term reform plan was to be consistent with the District of Columbia budget under FRMAA. *Id.* § 2101(a)(1). Although the Reform Act provides differing roles for the varying government entities involved in the planning process, the Board of Education has final "approval" authority for nearly all of the actions to be taken pursuant to that Act. *Id.* § 2311(d).

The last congressional action relevant to this case occurred in 1996, when Congress passed the FRMAA Amendments, giving the Control Board substantial additional powers. First, with respect to the schools, Congress directed the Control Board to improve the physical facilities of the schools by giving it the "authority to contract with a private entity (or entities) to carry out a program of school facility repair." FRMAA Amendments § 5201. Second, Congress gave the Control Board the power to issue such orders, rules and regulations

as it considers appropriate to carry out the purposes of [FRMAA], to the extent that the issuance of such an order, rule, or regulation is within the authority of the Mayor or the head of any department or agency of the District government, and any such order, rule, or regulation shall be legally binding to the same extent as if issued by the Mayor or the head of any such department or agency.

FRMAA Amendments § 5203(f) (amending FRMAA to add § 207(d)). Thus, the Control Board no longer has to make recommendations and await their adoption or rejection by the District of Columbia government, but may act directly to facilitate FRMAA's purposes.

### III. The Crisis in the District of Columbia Public Schools

Although this case will turn on whether the Control Board had authority to issue its November Order, the overarching issue of concern to the public is the manner in which Congress is restructuring power in the District of Columbia in an effort to improve services, including the education of its children. In that regard, it is instructive to consider the factual findings on which the Control Board rested its November Order after it initially noted that "the children of the District of Columbia are its most precious human resource", November Order p. 1, "every school age child in the District of Columbia deserves the best public education that available resources can provide", *id.,* and "an effective system of public education is an essential ingredient in the economic development and, hence, the ultimate fiscal recovery and economic stability of the District of Columbia." *Id.*

The Control Board went on to spell out the failings of the District of Columbia Public School System:

- in virtually every category and for every grade level, by virtually every measure of performance, the public school system has failed to provide a quality education

for all children and a safe environment in which to learn;

- test scores of District of Columbia public school students consistently fall below the national averages, and the test scores of comparable urban school districts, on the major examinations testing competency and student achievement;

- test scores of District of Columbia public school students in both reading and mathematics skills have declined substantially over the last five years to points well below the national norms;

- test scores of District of Columbia public school students in the economically disadvantaged sections of the District of Columbia have declined at a greater rate than scores in the more affluent sections of the city, reflecting a disparity in educational outcomes which needs to be remedied by improving educational opportunities in all areas of the District;

- a greater percentage of District of Columbia public school students and teachers report unacceptable levels of violence in the schools than the national average, including threats, attacks and weapons in the schools, and these and other behavior problems seriously interfere with the teaching and learning environment;

- poor management and resource utilization practices in the District of Columbia public schools have resulted in failure to allocate teachers and classrooms properly, failure to provide textbooks and other teaching materials in timely fashion, lack of proper training and teacher certification records, failure to provide disabled students with access to needed facilities, and inability to meet the educational needs of all students;

- mismanagement and maladministration of the public schools include: personnel mismanagement, resulting in a disproportionate number of personnel who do not contribute to the education of students; the lack of a comprehensive facilities plan, resulting in ineffective facilities funding; weak procurement controls, resulting in large amounts of money spent on questionable contracts; and poor overall budget and financial procedures, resulting in failure to develop adequate budgets or to monitor expenditures effectively;

- there has been an abdication and failure of leadership by the Board of Education and the present Superintendent of Schools in dealing with the problems of public schools;

- the Board of Education has defaulted in its responsibilities to oversee the school system, to provide proper supervision and evaluation of the present Superintendent of Schools, to carry on adequate review of the public schools' contracting and procurement practices, to pay sufficient attention to facilities maintenance, to scrutinize personnel and financial management, and to hold school personnel accountable for financial and personnel management, procurement, educational quality, and academic achievement; and,

- the cumulative impact of these failures and defaults on the education of District of Columbia public school students has been disastrous to public education, and continuance of the present situation in the public school system in the Nation's capital is intolerable.

November Order at p. 1–4.

The Control Board referred back to its legislative history and its mandate from Congress, stating:

- the Congressional Committee report on Public Law 104–8, which created the [Control Board], stated: "... the School Board budget is a significant portion of total District spending and its fiscal and management practices have been called into question by numerous sources. The Committee fully intends that the [Control Board] will carefully examine the operations of the School Board and include it in the necessary actions to solve the District's budget, fiscal, and management problems." (H. Rep. No. 104–96, 104th Cong., 1st Sess. 38–39 (1995)).

November Order at p. 4.

Finally, the Control Board concluded that:

• a state of crisis presently exists in the District of Columbia public school system.

November Order at p. 4.

## IV. Congress has Delegated to the Control Board the Statutory Authority to Issue the November Order and the Board Acted Within the Authority Granted It in Issuing the November Order

Whether the Control Board had the statutory authority to issue the November Order turns on two issues. The first is whether Congress delegated the powers at issue to the Control Board. The second is whether the Control Board acted within the scope of the powers Congress delegated to it in issuing the November Order.

### A. Congress Has Delegated Its Plenary Power Over the District of Columbia's Schools to the Control Board

■ It is undisputed that Congress has plenary legislative power over the District of Columbia, *Palmore v. United States,* 411 U.S. 389, 397, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973), and that it may exercise that power in any way it sees fit, so long as that exercise does not violate the constitutional rights of the District's citizens. *See e.g., id.* at 397, 93 S.Ct. at 1676; *Hobson v. Tobriner,* 255 F.Supp. 295 (D.D.C.1966). Congress may delegate all or part of these legislative powers to other bodies and may make such allocations of power among those bodies as it deems appropriate. *District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 109–10, 73 S.Ct. 1007, 1012–13, 97 L.Ed. 1480 (1953); *Amalgamated Meat Cutters & Butcher Workmen v. Connally,* 337 F.Supp. 737, 745 (D.D.C.1971) (three-judge court). As discussed earlier,[5] Congress has exercised that authority several times to create various governmental entities in the District of Columbia and to allocate and balance delegated powers among those entities. The issue is whether Congress has made such a delegation to the Control Board. For the reasons discussed below, the Court concludes that Congress

has delegated its plenary power to run the schools to the Control Board.

■ It cannot be contested that a financial crisis exists in the District of Columbia. The House Committee on Government Reform and Oversight detailed the evolution of the District's financial situation, the options available for addressing the crisis, and the manner in which other major metropolitan areas had addressed similar crises. S.Rep. No. 104–96, at 5–33 (1995). FRMAA's Findings state that Congress was undertaking a sweeping approach to remedy problems that "are pervasive across all segments of the government", FRMAA § 2(a)(4), (5), and that no part of the District was to be exempted from the oversight and authority of the Control Board, except the District of Columbia court system. FRMAA § 2(c)(3) ("nothing in this Act may be construed to amend, supersede, or alter the provisions ... of the District of Columbia code ... (pertaining to the organization, powers, and jurisdiction of the District of Columbia courts)"). In determining the intent of Congress with respect to the Control Board and the Board of Education, the court must look to the circumstances of FRMAA's enactment for, as our Court of Appeals has repeatedly stated, "Congressional intent can be understood only in light of the context in which Congress enacted a statute and the policies underlying its enactment." *Tataranowicz v. Sullivan,* 959 F.2d 268, 276 (D.C.Cir.1992), *cert. denied,* 506 U.S. 1048, 113 S.Ct. 963, 122 L.Ed.2d 120 (1993) (citations omitted). *See also Associated Gen'l Contractors v. California State Council of Carpenters,* 459 U.S. 519, 530, 103 S.Ct. 897, 904, 74 L.Ed.2d 723 (1983) ("A proper interpretation of the section cannot ... ignore the larger context in which the entire statute was debated"); *Washington Teachers' Union Local # 6 v. Board of Ed. of the Dist. of Columbia,* 109 F.3d 774, 776 (D.C.Cir.1997) (evaluating grant of new authority to Board of Education in light of District of Columbia's financial crisis).

■ When we examine the words of the statute, the amendment thereto, and the leg-

---

5. *See supra* Section III.

islative history of both, we find clear evidence that Congress intended to, and did, exercise its plenary legislative authority over the District so as to give the 'Control Board power to confront the education crisis in the District of Columbia.

### 1. Statutory Language

Our inquiry must, as always, begin with the language of FRMAA and its amendments. *See Southeastern Community College v. Davis,* 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979) (the "starting point in every case involving construction of a statute is the language itself"). To begin with, the Congressional Findings, which lay the foundation for the policy choices made by Congress, singled out those services that the District of Columbia has failed to provide effectively and efficiently. FRMAA § 2(a)(2). The very first municipal service identified by Congress was education. *Id.* FRMAA's Purpose includes "ensur[ing] the most efficient and effective delivery of services", *id.* § 2(b)(2), "conduct[ing] necessary investigations and studies to determine the fiscal status and operational efficiency of the District government", *id.* § 2(b)(3), "assist[ing] the District government in restructuring its organization . . . to ensure that the residents of the District of Columbia are served by a local government that is efficient and effective", *id.* § 2(b)(4)(A), and "assist[ing] the District government in ensuring the appropriate and efficient delivery of services". *Id.* § 2(b)(4)(C).

Plaintiffs argue that this language is merely prefatory and not binding. However, "[a]ny party attempting to demonstrate that the introductory wording of a section in a statute should be deemed inapplicable to one of its subsections . . . must carry a heavy burden of persuasion." *General Serv. Employees Union Local No. 73 v. NLRB,* 578 F.2d 361, 366 (D.C.Cir.1978). Plaintiffs fail to meet this burden.

Congress gave the Control Board a broad mission to carry out FRMAA's purposes and authorized it to "incorporate in its by-laws, rules, and procedures . . . such rules and regulations of the District government as it considers appropriate to enable it to carry out its activities under this Act with the greatest degree of independence practicable." *Id.* § 101(e)(3). It gave the Control Board the power to hold hearings, obtain official data from the Federal and District governments, subpoena witnesses, enter into contracts to carry out its responsibilities and seek judicial enforcement of its authority to carry out its responsibilities. *Id.* § 104.

To ensure its independence from the District government, Congress provided that the Control Board would not be subject to the control, supervision, oversight, or review of either the Mayor or the City Council. *Id.* § 108(b). Further, to avoid any conflicts of interest between the Control Board and the District government, Congress provided that the Corporation Counsel of the District of Columbia, which represents the District of Columbia government in all litigation, could not represent the Control Board. *Id.* § 108(c).

In addition to changing the District's overall budgeting process, FRMAA also made very significant changes with respect to processing the annual budget of the public schools. Before Congress passed FRMAA, the Board of Education submitted its budget estimate to the Mayor, who, with his recommendations, simply included it, unchanged, in the overall appropriations request for the District of Columbia. D.C.Code § 31–103 (1995). FRMAA gave the Mayor significant new authority to submit a separate, different request to Congress for the public schools' appropriations. *Id.* § 202(g)(1) (amending § 2(h) the 1906 Act, D.C.Code § 31–103). FRMAA also gave the Mayor and City Council line item authority over the amount and purpose of public school expenditures. *Id.* § 202(g)(2) (amending Home Rule Act § 452). These significant changes in the budget process for the District of Columbia school system demonstrate Congress' intent to limit the Board of Education's fiscal independence.

Finally, Congress further altered the balance of power between the Control Board and the District government when it enacted the FRMAA Amendments. The FRMAA Amendments included section 207(d), which gave the Control Board sweeping authority

to issue orders, rules, and regulations that would be valid if issued by the "Mayor or the head of any department or agency of the District government." The November Order falls squarely within the words of this section. Thus, reading section 207(d) in conjunction with the Findings provision applying FRMAA to all sectors of the District government, this Court can reach only one conclusion—that Congress intended to delegate to the Control Board many of the powers that it has the constitutional authority to exercise in the nation's capital.

Thus, the statutory language of FRMAA and its Amendments compel the conclusion that Congress did delegate its authority over the public schools to the Control Board.

### 2. Legislative History

The legislative history of FRMAA and its Amendments fully supports this conclusion. The Committee Report accompanying FRMAA reflects Congress' concerns about the state of the District of Columbia's financial affairs. "The problems this legislation is designed to alleviate now approach horrendous proportions. The District of Columbia ('The City') is facing its worst crisis in over a century. Every Member of Congress is familiar with The City's financial woes." H. Rep. 104-96, 104th Cong., 1st Sess., at 4 (1995). There is no question that Congressional concern extended to the public schools and the Board of Education. "[T]he School Board budget is a significant portion of total District spending and its fiscal and management practices have been called into question by numerous sources. The Committee fully intends that the [Control Board] will carefully examine the operations of the School Board and include it in the necessary actions to solve the District's budget, fiscal, and management problems." *Id.* at 38–39.

The legislative history of the FRMAA Amendments also directly addresses what actions Congress intended the Control Board to take with respect to the District's public schools. In particular, the House Conference Report stated:

The conferees are extremely concerned about the severe mismanagement of the District of Columbia Public School System. A breakdown in oversight and accountabili-

ty has occurred at the expense of the children in this city and *strong and immediate action must be taken to reverse this situation. The conferees anticipate that the Financial Responsibility and Management Assistance Authority* (control board) *will take such action* to improve the management of the District of Columbia Public Schools.

H. Rep. 104-863, at 1180 (1995) (emphasis added).

Thus, although Congress has not explicitly amended the District Charter, it has passed a series of laws, all stemming from the financial crisis in the District of Columbia, which, together, operate to alter the relationship of the various entities of the District government to one another. Congress is constitutionally empowered to take such action and, in passing the Home Rule Act, specifically reserved its authority to do so. The November Order is fully consistent with the direction Congressional action has taken to restrict the powers of the Board of Education.

### 3. Plaintiffs' Contentions

Plaintiffs argue that FRMAA section 207(d), which gives the Control Board the authority to issue orders, does not apply to independent agencies, such as the Board of Education. Plaintiffs rely on FRIMAA section 207(a)(3), which draws a distinction between "agencies" and "independent agencies" to support their contention that Congress intended that distinction to apply throughout section 207. Although Plaintiffs' argument is not without some appeal, the Court finds it unconvincing for several reasons.

■ First, the statute itself compels the conclusion that independent agencies are subject to the Control Board's power to "issue orders, rules or regulations". FRMAA section 305 provides definitions for terms used "[i]n this Act" and reads in pertinent part:

The term "District government" means the government of the District of Columbia, including any department, agency or instrumentality of the government of the District of Columbia; any independent

agency of the District of Columbia established under part F of title IV of the [Home Rule Act] or any other agency, board, or commission established by the Mayor or the Council ...

FRMAA § 305(5).[6] Since section 207(d)(1) gives the Control Board the authority to take those actions that would be valid if taken by the head of any department or agency of the "District of Columbia government", those powers must, pursuant to section 305(5), extend to an independent agency such as the Board of Education.

■■■ Second, general rules of statutory construction lead to the conclusion that section 207(d) applies to independent agencies. The phrase "any" department or agency is all-inclusive. Where a broad term like "any agency" is used, it would generally subsume and include within it the narrower term "independent agency". if Congress had intended to limit the coverage of section 207(d) to particular agencies of the District of Columbia government, it could easily have said so. As a rule, where a broad term is used, inferring an exception or exclusion is not favored. *See, e.g.,* 2A Sutherland, *Statutory Construction* ¶ 47.11 (5th ed.1992); *accord Acron Invests. v. Federal Savs. & Loan Ins. Corp.,* 363 F.2d 236, 239 (9th Cir.) ("An 'independent agency' is no less an 'agency' in the ordinary sense of the word ...."), *cert. denied,* 385 U.S. 970, 87 S.Ct. 506, 17 L.Ed.2d 434 (1966). Further, words in a statute are ordinarily given their normal meaning, absent some compelling reason to assign a different meaning. Where, as here, the language is unambiguous, it should be given its straightforward, literal meaning. *See Consumer Product Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Immigration & Naturalization Svc. v. Chadha,* 462 U.S. 919, 929, 103 S.Ct. 2764, 2772-73, 77 L.Ed.2d 317 (1983). Plaintiffs have offered no reason to deviate from these long established rules of statutory construction.

Third, this reading furthers Congress' overall purpose to impose fiscal responsibility on the District of Columbia. Section 207(a)(3) directs the Control Board to look at existing District of Columbia government entities and the allocation of delegated power among those entities, and evaluate the efficiency of those structural arrangements from a fiscal and financial management perspective. In section 207(a)(3), Congress is directing the Control Board to make recommendations that exempt no part of the District Government from potential restructuring. Section 207(d)(1), on the other hand, refers to the allocation of power between the Control Board, as an independent entity appointed by Congress, and the District of Columbia government in its entirety. In light of the purposes of the statute, the crisis that precipitated its passage, and Congress' specific statement that the Control Board must address the problems in the District of Columbia's schools, it would make no sense to read section 207(d)(1) to exclude the Board of Education.

Relying on one isolated clause in FRMAA's Findings section to support their position that no changes can be made to any entities that were established by the District Charter, Plaintiffs cite FRMAA section 2(a)(5), which provides that the Control Board's approach should "preserve[ ] home rule". Again, their arguments are unpersuasive.

First, Plaintiffs contend that, because FRMAA made a number of explicit changes to the District Charter that were unrelated to the structure and operation of the Board of Education, Congress intended to make only those specific changes and to leave unaffected all other District Charter provisions, including those relating to the Board of Education and its operations and functions. However, as was conceded at oral argument, Congress need not specifically state in its legislation that it is amending the District Charter to effect a change to it and, thus, Plaintiffs' argument must be rejected.

Second, "a statute is to be read as a whole", *King v. St. Vincent's Hosp.,* 502 U.S. 215, 220, 112 S.Ct. 570, 574, 116 L.Ed.2d 578

---

**6.** Other District of Columbia statutes share the same definition. *See* Administrative Procedure Act, D.C.Code § 1–1502(3) ("The term 'agency' includes both subordinate agency and independent agency.").

(1991) (citing *Massachusetts v. Morash*, 490 U.S. 107, 115, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989)). It is significant that in a statute spanning more than 60 pages and containing hundreds of sections, Congress mentioned "Home Rule" only once. Although there are nine separate findings set forth in the Findings section, Congress did not address Home Rule until the fifth finding. When Congress did reach that issue, it was in the context of mandating a "comprehensive approach to fiscal, management, and structural problems", which "exempts no part of the District government", but which "preserves home rule". Congress cannot have intended FRMAA's interpretation and meaning to turn on one isolated phrase of the Act, especially where that provision would seriously undermine accomplishment of the goals Congress had set forth.

In light of the structure of the statute, Congress' stated purposes, and general canons of statutory construction, the Court concludes that the Board of Education is an agency in whose shoes the Control Board may stand. Because the Control Board's November Order is totally consistent with Congress' intent and is authorized by Congress' delegation of its plenary legislative power over the District of Columbia, it is valid so long as the Control Board acted within the parameters of FRMAA section 207(d).

## B. The Control Board Did Not Act *Ultra Vires* in Promulgating the November Order

Plaintiffs argue that even if the Control Board was delegated the authority to issue the November Order, it acted *ultra vires* by delegating to the Board of Trustees the power to run the schools that Congress had delegated to it. FRMAA section 207(d), as previously noted, gives the Control Board the authority to issue any order that would be valid if issued by the Mayor or the head of an agency of the District of Columbia government. Both parties concede that the power of the Mayor is not at issue in this case. The issue, then, is whether the Board of Education could have delegated authority in the same way that the Control Board did. For the reasons discussed below, the Court concludes that it could have.

District of Columbia law authorizes the Board of Education to "delegate any of its authority to the Superintendent. The Superintendent is authorized to redelegate any of his or her authority subject to the approval of the [Board of Education]." D.C.Code. § 31–107. Plaintiffs argue that this provision sets limits on the extent of the Board of Education's authority to delegate. However, the statute provides that the Board of Education can delegate "any" of its authority. "Any", for the reasons discussed earlier, encompasses "all".

Plaintiffs rely on *Coleman v. District of Columbia*, 279 F. 990, 992 (1922), for the proposition that the Board of Education cannot delegate its power to anyone else. *Coleman*, however, is neither controlling nor persuasive, since it was decided prior to the enactment of D.C.Code § 31–107, that is, before Congress had given the School Board statutory authority to delegate any of its powers.

In promulgating the November Order, the Control Board delegated nearly all of the Board of Education's authority to the Board of Trustees. Some of that power has been re-delegated by the Board of Trustees to the CEO–Superintendent. D.C.Code section 31–107 clearly contemplates that such a delegation would be lawful if undertaken by the Board of Education itself to the Superintendent, and by the Superintendent to a third party. Therefore, the delegation, when undertaken by the Control Board, standing in the Board of Education's shoes, must also be lawful under FRMAA section 207(d).

At oral argument, Plaintiffs pointed out that under any delegation pursuant to D.C.Code section 31–107, the Board retains authority over the Superintendent. They argued that the Board of Education would not have the ability to completely divest itself of power over the schools because there would be no one supervising its delegates. However, this argument fails to acknowledge that the November Order provides that the Control Board itself will oversee the Board of Trustees. November Order, ¶ 17 (setting up

reporting mechanisms and requirements). The Control Board retains the same ultimate supervisory authority over its delegate, the Board of Trustees, as the Board of Education had over its delegate, the Superintendent of Schools. That is, if the Control Board is not satisfied with the performance of the Board of Trustees in any or all of the areas over which it gave it control, the Control Board can divest the Board of Trustees of any or all of the powers granted by the November Order. Thus, the Control Board is, in fact, exercising its supervisory authority in the same way that the Board of Education did prior to the November Order. Since, pursuant to FRMAA section 207(d), the Control Board is "standing in the shoes" of the Board of Education, its action is valid.

For all of these reasons, the Court concludes that the Control Board had the statutory authority to issue the November Order.

## V. The November Order Did Not Violate the First Amendment Rights of Plaintiffs in their Official Capacities as School Board Members

Plaintiffs challenge the November Order as unconstitutionally infringing their right to vote on matters of public interest as they see fit. *See Clarke v. United States,* 886 F.2d 404, 411–12 (D.C.Cir.1989), *vacated as moot,* 915 F.2d 699 (1990) (*en banc*); *Stella v. Kelley,* 63 F.3d 71, 75 (1st Cir.1995). Plaintiffs' Amended Complaint asserts that "the Control Board has forced and intends in the future to force the members of the Board of Education" to vote in favor of delegating their authority to the Board of Trustees and the CEO–Superintendent. Compl. § 20. However, Plaintiffs conceded at oral argument that the November Order took effect without any action being required of the Board of Education. Thus, Plaintiffs have not been "forced" to vote in violation of their First Amendment rights.

Plaintiffs complain that they will be harmed if the Control Board requires them to vote to delegate any of their remaining authority (i.e., to act as a chartering authority). Defendant argues that Plaintiffs' claim is not yet ripe, that is, that it is premature because Defendant has not "forced" Plaintiffs to do anything.

The judicial power of the United States extends only to actual cases or controversies. U.S. Const. art. III, § 1. Ripeness is a justiciability doctrine that gives meaning to Article III's case or controversy requirement. *See Navegar Inc. v. United States,* 103 F.3d 994, 997–98 (D.C.Cir.1997); *National Treasury Employees Union v. United States,* 101 F.3d 1423, 1427 (D.C.Cir.1996) (*"NTEU"*). Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review. *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

Ripeness requires "that injury in fact be certainly impending." *NTEU,* 101 F.3d at 1427 (citations omitted). To establish injury in fact, a plaintiff cannot rely on an injury that is conjectural, hypothetical, speculative or abstract. *Id.* (citations and quotations omitted). There is simply no evidence on this record that Plaintiffs have suffered, or are certain to suffer, any injury to their First Amendment rights.

Plaintiffs cite *Washington Serv. Contractors Coalition v. District of Columbia,* 858 F.Supp. 1219, 1224 n. 8 (D.D.C.1994), *vacated on other grounds and remanded,* 54 F.3d 811 (D.C.Cir.1995), for the proposition that they need not allege imminent harm to obtain declaratory relief if the "probability of the future event occurring is real and substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* However, on this record, Plaintiffs cannot even meet that standard, which the courts generally apply in a criminal, rather than civil, context. Such a challenge requires that there be a significant threat of enforcement against the person challenging the statute. *See Navegar,* 103 F.3d at 998–99 (enumerating cases where pre-enforcement challenges have been allowed).

Here, there is no credible threat that such an action by the Control Board is even on the horizon. The Control Board's November Order was self-executing. There is no reason

to believe that the Control Board would not follow the same procedure in the future, and, therefore, would neither force nor require the members of the Board of Education to vote contrary to their beliefs.[7] For these reasons, the Court concludes that the First Amendment claim raised by Plaintiffs in their official capacities is premature, and therefore must be **denied.**

## VI. The November Order Did Not Violate the First or Fifth Amendment Rights of Plaintiffs' in their Individual Capacities as District of Columbia Voters

Plaintiffs challenge the November Order on First and Fifth Amendment grounds, claiming that the action has impermissibly interfered with their voting rights. These challenges are closely intertwined and will be addressed together. Plaintiffs' argument is, essentially, as follows. Plaintiffs themselves are individual voters. The members of the Board of Education for whom they voted now have less power than they had before issuance of the November Order. Thus, Plaintiffs' individual votes have been unconstitutionally "diluted".

The Supreme Court has clearly held that the Constitution does not require that a school board be elected. *Sailors v. Board of Education,* 387 U.S. 105, 108, 110–11, 87 S.Ct. 1549, 1552, 1553, 18 L.Ed.2d 650 (1967). That principle had already been expounded with respect to the District of Columbia when the Board of Education was still appointed by the Supreme Court for the District of Columbia. *Hobson v. Hansen,* 265 F.Supp. 902, 918 (D.D.C.1967) (three-judge court). In *Hansen,* the court specifically held that none of the guarantees of personal liberty were infringed by the appointment, rather than the election, of the Board of Education. *Id.*

 Once the right to vote is granted, the Constitution requires that each citizen be able "to participate in elections on an equal basis with other citizens in the jurisdiction." *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 10, 102 S.Ct. 2194, 2200, 72 L.Ed.2d 628 (1982). Here, Plaintiffs have not been denied the right to vote *vis-a-vis* other residents of the District; nor have they been denied the right to vote because of an impermissible reason (such as race or gender); nor have they been denied outright the right to vote. There is simply no precedent holding that the First Amendment is violated if the powers and responsibilities of an elected office are changed or diminished. Thus, Plaintiffs have no cognizable First Amendment claim that the Control Board has impermissibly infringed their individual voting rights.

With respect to Plaintiffs' Fifth Amendment claim, it is certainly true that the right to vote is a fundamental right protected by the Constitution, *Reynolds v. Sims,* 377 U.S. 533, 554, 84 S.Ct. 1362, 1377–78, 12 L.Ed.2d 506 (1964), and that courts are bound to protect such fundamental constitutional rights. *See Franz v. United States,* 712 F.2d 1428, 1438 (D.C.Cir.1983) (Bork, J., concurring in part and dissenting in part). Plaintiffs contend that, since Congress granted District of Columbia voters the right to elect the Board of Education, that right cannot be abridged in any way. The distinction, again, that Plaintiffs seem to overlook, is that the Control Board has not taken away or in any way abridged their right to vote for members of the Board of Education.

 Plaintiffs' real argument is that the Board of Education for which they are now voting is a body with different powers than the one that they used to elect. However, Plaintiffs can cite to no case which stands for the proposition that a change in the powers of the body for which they are voting affects their right to vote in a constitutionally proscribed manner.[8] *Hansen,* 265 F.Supp. at 917. Moreover, since the Fifth Amend-

---

7. At Oral Argument, Plaintiffs' counsel conceded as much.

8. Although Plaintiffs cite numerous decisions in support of their claims, none of those cases is on point, as those cases involved equal protection challenges to a state's voting procedures. *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). In this case, there is no allegation that Plaintiffs' associational rights are being infringed in a way that denies them equal protection of the laws.

ment does not require that a school board even be elected, *see Sailors,* 387 U.S. at 108, 110–11, 87 S.Ct. at 1552, 1553; *Hansen,* 265 F.Supp. at 918, it logically follows that it does not require that an elected school board have any particular powers. This is especially true in the District of Columbia where the creation of the Board of Education, and its manner of selection, falls squarely within the plenary legislative power exercised by Congress over our nation's capital.[9]

## VII. *Conclusion*

Plaintiffs have presented a serious substantive challenge to the actions of the Control Board. The votes cast for the members of the Board of Education by Plaintiffs, as well as by all other voters in the District of Columbia, may well have less substance than they did before the Control Board promulgated the November Order. However, Congress has the power to create the various governmental bodies in the District of Columbia, to alter their structure and authority, and even to abolish them entirely. Plaintiffs, as well as all District of Columbia residents, may feel profoundly discomfited by the November Order and its implications for "Home Rule" in the District of Columbia, but the Plaintiffs' challenge to the recent changes in our local political process is not constitutionally cognizable under existing case law.

For the reasons discussed above, Defendant's Motion to Dismiss [10] is **granted** and Plaintiffs' Motion for Summary Judgment [11] is **denied.**

An Order will issue with this Opinion.

### ORDER

This matter is before the Court on Defendant's Motion to Dismiss [# 10] and Plaintiffs' Motion for Summary Judgment [# 11]. For the reasons discussed in the accompanying Memorandum Opinion, it is this 30th day of April, 1997, hereby

**ORDERED,** that Defendant's Motion to Dismiss [10] is **granted;** and it is further

**ORDERED,** and Plaintiffs' Motion for Summary Judgment [11] is **denied.**

9. Claims under 42 U.S.C. § 1983 must rest on constitutional violations. Since this Court has found no constitutional violation, Plaintiffs' section 1983 claim must be dismissed.