132 F.3d 775
 328 U.S.App.D.C. 74, 122 Ed. Law Rep. 1168
 Karen SHOOK, et al., Appellants,
v.
DISTRICT OF COLUMBIA FINANCIAL RESPONSIBILITY AND MANAGEMENT
ASSISTANCE AUTHORITY, Appellee.
 No. 97-7087.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 4, 1997.
Decided Jan. 6, 1998.
 
 Appeal from the United States District Court for the District of Columbia (96cv2601).
 Barbara S. Wahl, Washington, DC, argued the cause for appellants, with whom Evan S. Stolove and Ronald C. Jessamy were on the briefs.
 Daniel A. Rezneck, Washington, DC, argued the cause and filed the brief for appellee.
 Alan B. Morrison, Washington, DC, argued the cause for amici curiae Missionary Baptist Ministers Conference for Washington D.C. and Vicinity, et al.
 Before: SILBERMAN, WILLIAMS, and GARLAND, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 Appellants challenge an order issued by the District of Columbia Financial Responsibility and Management Assistance Authority (Control Board), divesting the District of Columbia Board of Education of control over the District's public schools and transferring the vast majority of the Board of Education's powers to an Emergency Transitional Education Board of Trustees. The district court dismissed appellants' claims that the order exceeded the scope of the Control Board's statutory authority and violated appellants' Fifth Amendment rights. We affirm in part and reverse in part.
 
 I.
 
 2
 The District of Columbia Board of Education was created by Congress in 1906. At the time of its inception, its nine members were appointed by the judges of the Supreme Court of the District of Columbia (something of a forerunner to the present federal courts). Congress placed "control" of the District's public schools in the Board of Education, giving it a wide range of powers, including determination of general educational policy, appointment of teachers, and selection and supervision of the Superintendent. In 1968, Congress changed the method of selecting the Board of Education to election by District citizens. Five years later, Congress passed the District of Columbia Self-Government and Governmental Reorganization Act (Home Rule Act), which granted greater rights of self-determination to District citizens and set forth the structural framework of the District government in the District Charter. Similar in certain respects to a state constitution, the Charter established the Board of Education as one of five independent agencies existing outside the control of the executive or legislative branches of the District government. Home Rule Act § 495, D.C.CODE ANN.s 31-101 (1981). Under the Charter, the Board of Education retained all authority that previously had been granted to it by Congress, including "control of the public schools." The Board of Education is required to appoint a Superintendent who "shall have the direction of and supervision in all matters pertaining to the instruction in all the schools under the Board of Education." D.C.CODE ANN. § 31-107 (1981). The Superintendent may be removed at any time by the Board of Education "for adequate cause affecting his character and efficiency as Superintendent." D.C.CODE ANN. § 31-110 (1981).
 
 
 3
 In 1995, 22 years after the advent of home rule, Congress found that the District government was in the midst of a "fiscal emergency," plagued by "pervasive" mismanagement and "fail[ing] to deliver effective or efficient services" to residents. District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub.L. No. 104-8, § 2(a)(1), (2) & (4), 109 Stat. 97, 98 (1995) (FRMAA). In response, it established what is popularly known as the Control Board. Composed of five members appointed by the President of the United States, the Control Board has been given wide-ranging powers to improve the District government's operations.
 
 
 4
 In 1996, Congress amended the FRMAA to strengthen the Control Board. Under § 207(d), it was given the ability to issue:
 
 
 5
 such orders, rules, or regulations as it considers appropriate to carry out the purposes of this Act and the amendments made by this Act, to the extent that the issuance of such an order, rule, or regulation is within the authority of the Mayor or the head of any department or agency of the District government, and any such order, rule, or regulation shall be legally binding to the same extent as if issued by the Mayor or the head of any such department or agency. (Emphasis added).
 
 
 6
 The Control Board, exercising power under that section, issued an order on November 15, 1996, reorganizing administration of the District's public schools. After finding what it perceived as the alarming condition of the school system, the November Order "established a 9-member Emergency Transitional Education Board of Trustees ... to assume immediate responsibility for the operation and management of the District of Columbia public school system."[1] November Order at p 2. The Board of Trustees was delegated "all the authority, powers, functions, duties, responsibilities, exemptions, and immunities of the Board of Education." Id. at p 6. The Order also discharged the Superintendent and redesignated his position as the CEO-Superintendent, an agent of the Control Board. The Control Board asserted the power to appoint the first CEO-Superintendent, but delegated the responsibility to appoint his successors to the Board of Trustees subject to the Control Board's approval. The Control Board or the Board of Trustees with the approval of the Control Board was empowered to remove the Superintendent from office at will. Id. at pp 7, 21. The Board of Education was left only with authority to license charter schools and to provide advice to the Board of Trustees, although its President was made a member of the Board of Trustees.
 
 
 7
 The Control Board's order relied on authority under § 207(d) to step into the shoes of the Board of Education, and with that power it in turn relied on D.C.Code § 31-107, which reads in part, "[t]he Board of Education is authorized to delegate any of its authority to the Superintendent. The Superintendent is authorized to redelegate any of his or her authority subject to the approval of the Board." The order, however, provides for a direct delegation from the Control Board to the Board of Trustees and a direct delegation from the Control Board to the Superintendent to perform all the duties theretofore performed by the old Superintendent as well as any other powers delegated by the Board of Trustees.
 
 
 8
 Appellants are 11 present and former members of the Board of Education who voted in the November 1996 Board of Education elections and sued in the district court seeking declaratory and injunctive relief. They claimed for a number of reasons that the order exceeded the Control Board's authority and even violated the Constitution by abridging their Fifth Amendment right to vote for school board members. The district court rejected all of appellants' claims on a motion to dismiss. Addressing appellants' argument that even if the Control Board had the power to step into the shoes of the Board of Education it surely could not, in that capacity, delegate the Board of Education's responsibility to a Board of Trustees--it could only delegate to the Superintendent--the court said,
 
 
 9
 In promulgating the November Order, the Control Board delegated nearly all of the Board of Education's authority to the Board of Trustees. Some of that power has been re-delegated by the Board of Trustees to the CEO-Superintendent. D.C.Code § 31-107 clearly contemplates that such a delegation would be lawful if undertaken by the Board of Education itself to the Superintendent, and by the Superintendent to a third party. Therefore, the delegation, when undertaken by the Control Board, standing in the Board of Education's shoes, must also be lawful under FRMAA § 207(d).
 
 
 10
 Shook v. D.C. Fin. Responsibility and Management Assistance Auth., 964 F.Supp. 416, 429 (D.D.C.1997) (emphasis added).
 
 II.
 
 11
 The Control Board contends, prompted by our own request that both parties discuss the issue, that we lack jurisdiction to review its action because § 207(d)(3) of the statute creating the Control Board provides that: "[t]he decision by the [Control Board] to issue an order, rule, or regulation pursuant to this subsection shall be final and shall not be subject to judicial review." We certainly respect congressional limitations of judicial review, see, e.g., Ayuda, Inc. v. Thornburgh, 880 F.2d 1325, 1339-40 (D.C.Cir.1989), vacated, 498 U.S. 1117, 111 S.Ct. 1068, 112 L.Ed.2d 1174 (1991), aff'd on remand, 948 F.2d 742 (D.C.Cir.1991), vacated sub nom. Ayuda, Inc. v. Reno, 509 U.S. 916, 113 S.Ct. 3026, 125 L.Ed.2d 714 (1993), aff'd on remand, 7 F.3d 246 (D.C.Cir.1993), cert. denied, 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 26 (1994), but we are bound to follow the Supreme Court's doctrine under which "[t]he presumption in favor of judicial review may be overcome only upon a showing of 'clear and convincing evidence' of a contrary legislative intent." Traynor v. Turnage, 485 U.S. 535, 542, 108 S.Ct. 1372, 1378, 99 L.Ed.2d 618 (1988) (citing Abbott Lab. v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511-12, 18 L.Ed.2d 681 (1967) (citations omitted)).
 
 
 12
 With that in mind, we note that the preclusion of review language is rather peculiar. It does not say that an order issued by the Control Board is immune from judicial review, but rather that the decision to issue such an order is not reviewable. Turning to the legislative history for clarification, we find in the Conference Report accompanying the 1996 Amendments an explanation that the language was designed to "waive[ ] all judicial review as to the authority of the control board to issue orders, rules, or regulations but does not waive judicial review as to the content of the orders, rules, and regulations." H.R. CONF. REP . No. 104-863, at 1182 (1996). We confess that we are uncertain as to what line Congress was drawing. It appears most likely that Congress meant the Control Board could not be challenged as to its basic authority to issue orders, rules, or regulations--it is an unpaid voluntary group that was to be recognized as exercising governmental powers--and that its internal decisionmaking process was not reviewable, but the actual content of individual orders could be challenged as exceeding its authority. The Control Board's counsel bravely asserted that no Control Board order, no matter how outrageous (including, hypothetically, taking control of the Prince George's County school system), could be challenged in federal court, but we simply do not believe that such an awesome delegation of unchecked authority can be drawn from Congress' unclear statutory wording (and an ambiguous Conference Report). If we had any doubt as to that conclusion--which we do not--we would have to consider that preclusion of judicial review is particularly disfavored when applied to prevent a plaintiff from asserting a constitutional claim. See Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 681 n. 12, 106 S.Ct. 2133, 2141, 90 L.Ed.2d 623 (1986).
 
 III.
 
 13
 Turning to the merits, appellants present both broad and narrow challenges to the Control Board's order. The broad challenge--contesting the Control Board's authority to encroach into the domain of the Board of Education--is based primarily on the claim that the Control Board's power is limited vis-a-vis an independent agency of the District government. § 207(d), upon which the Control Board relied, authorizes the Control Board to issue directives "to the extent that the issuance of such an order, rule, or regulation is within the authority of the Mayor or the head of any department or agency of the District government." It is clear that this section gives the Control Board enormous power vis-a-vis the Mayor, as well as all department and agency heads subordinate to the Mayor. It is also undisputed that § 207(d) does not grant the Control Board the same direct authority to act in the stead of the D.C. Council.[2] By not including in § 207(d) the term independent agency, by which the Board of Education sometimes is described in the same statute and other legislation dealing with the District, appellants argue Congress must not have intended the Board of Education and other independent agencies to be subject to this extraordinary Control Board power. They point to § 207(a)(3) of the FRMAA, which empowers the Control Board to make recommendations relating to "the structural relationship of departments, agencies, and independent agencies." (Emphasis added.) And, they refer us to § 305(5), which defines "District government" as "the government of the District of Columbia including any department, agency, or instrumentality of the government of the District of Columbia; [or] any independent agency of the District of Columbia established under part F of title IV of the District of Columbia Self-Government and Governmental Reorganization Act," which, as we noted, is the section of the District Charter designating the Board of Education and four other entities as independent agencies. (Emphasis added.) Because Congress has differentiated between agencies and independent agencies in these other provisions, appellants would have us read "any agency" as used in § 207(d) as limited to those departments and agencies under the Mayor's direct control.
 
 
 14
 The Control Board responds that "any agency," as a matter of simple English, includes "any independent agency," because the greater includes the lesser. See Acron Inv. v. Federal Sav. & Loan Ins. Corp., 363 F.2d 236, 239 (9th Cir.1966) ("An 'independent agency' is no less an 'agency' in the ordinary sense of the word...."). It also points to at least two places in the original FRMAA where the single word "agency" has been understood to include the Board of Education. In § 301(a)(1)(C), the District's "budget" is defined to include "appropriations or loan or spending authority for all activities of all departments or agencies of the District of Columbia," (emphasis added), and in § 302(a), the Chief Financial Officer is assigned the duty of "[m]aintaining custody of all public funds ... of the District government (or any department or agency of the District government)" (emphasis added). Both of these provisions have been administered without protest under the assumption that the Board of Education was a covered "agency," and appellants do not claim that assumption is incorrect. Furthermore, § 5203(d) of the 1996 FRMAA Amendments authorizes Control Board review of rulemaking of a "rule or regulation issued or proposed to be issued by the Mayor (or the head of any department or agency of the District government) in the same manner as such provisions apply to a contract or lease" (emphasis added). As the Control Board has the power to review an independent agency's contracts and leases pursuant to § 203(b)(2)(A) of the original FRMAA, the reference to "any department or agency" in the rulemaking review provision, the Control Board argues, similarly must encompass the Board of Education.
 
 
 15
 Although there is no definitive indication in the statute itself as to Congress' intent, the preamble to the FRMAA does include the finding that "the District of Columbia government fails to provide its citizens with effective and efficient services in areas such as education." FRMAA § 2(a)(2). And turning again to the legislative history, we see no suggestion that Congress intended to exclude independent agencies, like the Board of Education, from the 207(d) power as one might expect to find if Congress had meant to draw the distinction. Indeed, the Conference Report accompanying the bill which includes § 207(d) expresses the conferees' concern about the "severe mismanagement of the District of Columbia Public School System" and states that "strong and immediate action must be taken to reverse this situation." H.R. CONF. REP. NO. 104-863, at 1180 (1996) (emphasis added). It was "anticipate[d] that the [Control Board] will take such action to improve the management of the District of Columbia Public Schools." Id. Appellants urge us to discount this language, pointing out that the conferees expressed their expectation in the section of the Conference Report dealing with the allocation of funds for "education facilities improvement," and not the section explaining the 207(d) power. We think the language is significant, however, because it refers to the management of the schools generally rather than to the management of school facility improvements, which is discussed later in the same section of the Conference Report.
 
 
 16
 The only provision in the FRMAA that could authorize the Control Board to take such immediate (and strong) action is § 207(d). Although the Control Board could implement recommendations for reorganizing administration of the schools under § 207(c), its action would not be immediate. The District government is given 90 days in which to respond to such recommendations, and if the Control Board's recommendations are rejected, they can only be implemented after consultation with the appropriate congressional committees. While we find it a bit mystifying that the conferees included this important indication of their purpose in the wrong section of the conference report, we nevertheless think it evidences Congress' understanding that the Control Board is able to use its 207(d) power to issue orders as if it were the Board of Education.
 
 
 17
 Even if the Control Board may use § 207(d) vis-a-vis the Board of Education, appellants argue that it may not displace the Board of Education entirely because that would be inconsistent with the District Charter which specifically provides that "[t]he control of the public schools in the District of Columbia is vested in [the] Board of Education." D.C.CODE ANN. § 31-101 (1981). The Charter, however, is simply an Act of Congress which can be modified either expressly or impliedly by Congress as it wishes. (§ 601 of the Home Rule Act specifically reserves that power.) In that regard, the FRMAA is replete with modifications of the Charter. See, e.g., §§ 106(a)(4), 108(b)(2), 201, 202, 203, 204, 301, 302, 304. It seems rather obvious to us that once § 207(d) is interpreted to permit the Control Board to step into the shoes of the Board of Education, it can no longer be said that the Board of Education has unchallengeable "control" of the District school system.
 
 
 18
 Still, appellants contend that even our reading of § 207(d) merely gives the Control Board authority to issue orders, rules, or regulations[3] and does not prevent the Board of Education from issuing its own orders, rules, or regulations. But once the Control Board issues an order that could have been issued by the Board of Education, it is certainly not open to the Board of Education to take any act that would be inconsistent or in conflict with the Control Board's action. To be sure, § 207(d) does not explicitly restrict an agency's power to issue its own orders; but the effect is certainly implied. Congress, in a statute designed to ensure "efficient and effective" local government, FRMAA § 2(b)(4)(A), could not have possibly intended to create a system where neither the Control Board nor the Board of Education has the ultimate authority to implement policy. We think the Control Board can, by using § 207(d), assume any or all of the Board of Education's powers, and once it does so it surely "occupies the field." It is up to the Control Board, and only the Control Board, to determine what authority is left to the Board of Education.
 
 
 19
 Once we recognize that Congress has implicitly modified that section of the Charter vesting control of the schools in the Board of Education, it is apparent that appellants' constitutional arguments are based upon a false premise. It is claimed that appellants have a fundamental right to vote for a functioning Board of Education that has been taken away without due process. (What process they claim is due is unclear.) They rely on several cases from our sister circuits holding that "once citizens are granted the right to vote on a matter, the exercise of that vote becomes protected by the Constitution even though the state was not obliged to allow any vote at all." Hussey v. City of Portland, 64 F.3d 1260, 1263 (9th Cir.1995); see Duncan v. Poythress, 657 F.2d 691 (5th Cir. Unit B Sept.1981).[4] Appellants concede, however--as they must--that their right to vote for a Board of Education, granted by Congress, can be taken away by Congress. See Hobson v. Hansen, 265 F.Supp. 902 (D.D.C.1967) (three-judge court). Thus Congress' authorization to the Control Board to reduce, even drastically, the powers of the Board of Education does not raise an independent constitutional issue. Appellants are simply putting a constitutional gloss on their statutory claim.
 
 IV.
 
 20
 Appellants' narrower challenge assumes, arguendo, that the Control Board can employ § 207(d) to put itself in the place of the Board of Education and assumes that it has done so by this order. According to appellants, the order is illegal, nevertheless, because it exceeds the Board of Education's powers. It will be recalled that § 207(d) permits the Control Board to issue only those rules, regulations, or orders that are "within the authority of the ... head ... of any agency." And under D.C. law, "[t]he Board of Education is authorized to delegate any of its authority to the Superintendent," who in turn "is authorized to redelegate any of his or her authority subject to the approval of the Board."
 
 
 21
 It is perfectly clear that, notwithstanding the Control Board's citation of § 31-107 and the district court's conclusion that the Control Board adhered to that section, the Control Board did not follow § 31-107. For one thing, the Control Board, acting in the stead of the Board of Education, summarily fired the Superintendent without even mentioning a cause as required by § 31-110. See November Order at p 21. The prior Superintendent has not sued, but since the Control Board's order purports to assert the same power--to discharge the Superintendent at will--we are obliged to conclude that the order's claim to that authority is contrary to law.
 
 
 22
 The Control Board's order delegates to the newly designated CEO-Superintendent (we do not think there is any legal significance to the new title) the same broad authority the Board of Education had given to the prior Superintendent, November Order at p 8. This seems unobjectionable. But the Control Board further delegates to the Board of Trustees, and not the Superintendent, "the immediate responsibility for operation and management of the District of Columbia public school system." Id. at p 2. In other words, the order recognizes the Superintendent as the chief executive but gives to the Board of Trustees the overall governing responsibility. Yet § 31-107 does not explicitly authorize the Board of Education to delegate to anyone but the Superintendent. The Control Board responds that § 31-107 does not expressly prohibit the Board of Education from delegating to another entity besides the Superintendent and therefore there is no reason to read into the statute an implied limitation. As expected, appellants rely on the ancient maxim of statutory interpretation expressio unius est exclusio alterius, "the mention of one thing implies the exclusion of another." In Halverson v. Slater, 129 F.3d 180, 185 (D.C.Cir.1997), we recently applied the maxim. There, Congress statutorily authorized the Secretary of Transportation to delegate certain powers to Coast Guard officials. The Secretary argued, however, that the statute did not prohibit him from delegating those powers to non-Coast Guard officials as well. We held that the statute was intended to exclude delegations to non-Coast Guard officials. Id. 129 F.3d at 189.
 
 
 23
 We have recognized, however, that this maxim is often misused. See Cheney R.R. Co. v. ICC, 902 F.2d 66, 68-69 (D.C.Cir.1990) (reviewing misapplications of the maxim); but cf. Michigan Citizens for an Indep. Press v. Thornburgh, 868 F.2d 1285, 1293 (D.C.Cir.), aff'd by an equally divided Court, 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989) (explaining an appropriate use of the maxim). Sometimes Congress drafts statutory provisions that appear preclusive of other unmentioned possibilities--just as it sometimes drafts provisions that appear duplicative of others--simply, in Macbeth's words, "to make assurance double sure." That is, Congress means to clarify what might be doubtful--that the mentioned item is covered--without meaning to exclude the unmentioned ones. Cf. United States v. Hansen, 772 F.2d 940, 946-47 (D.C.Cir.1985). The maxim's force in particular situations depends entirely on context, whether or not the draftsmen's mention of one thing, like a grant of authority, does really necessarily, or at least reasonably, imply the preclusion of alternatives. That will turn on whether, looking at the structure of the statute and perhaps its legislative history, one can be confident that a normal draftsman when he expressed "the one thing" would have likely considered the alternatives that are arguably precluded. For that reason, we think the maxim should be used as a starting point in statutory construction--not as a close-out bid.
 
 
 24
 Bearing in mind the structure that Congress created to run the D.C. schools, we think, in this case, that the maxim points to a correct conclusion. It is unlikely that Congress drafted § 31-107 to reassure doubters that a Superintendent could indeed be the beneficiary of some general power of delegation possessed by the Board of Education, so that particular reason to mistrust the expressio canon is absent. Congress clearly expected--prior to passage of the FRMAA--that the Board of Education itself, as we have previously discussed, would "control" the schools. It is generally understood in the American administrative experience, however, that a multi-member body is better suited to policymaking than to administration. In our system of government, broadly speaking, Congress sets policy to be executed by the President; in the private world, a corporate Board of Directors is expected to set policy that is executed by a CEO. Surely drawing on that tradition, Congress provided that the Board of Education could delegate to its subordinate executive, the Superintendent. Since the Superintendent was, in turn, authorized to subdelegate his functions, we think that necessarily implies that the Board of Education could not have bypassed the Superintendent and delegated executive functions to someone else. Moreover, it would be unusual, if not unprecedented, for Congress to authorize the Board of Education to delegate its own governing authority, its policymaking function, to another outside multi-member body. That sort of delegation is inconsistent with the grant of overall authority to the Board of Education wholly apart from any negative implication arising from the statute's express authority to delegate to the Superintendent. We therefore conclude that under § 31-107 the Board of Education could not have delegated executive functions or policymaking authority to anyone but the Superintendent.
 
 
 25
 The Control Board contends that even though the order is not phrased in appropriate terms we should consider it as if it provided that the Control Board delegated to the Superintendent under § 31-107, and then he redelegated his authority to the Board of Trustees. But for reasons we have already suggested, we do not see how that scheme would work either. The Control Board's notion is inconsistent with the hierarchical framework Congress provided. We cannot read § 31-107 to permit the Superintendent to delegate the authority to supervise himself to another policymaking body. Surely it cannot be contemplated that the Board of Education could delegate to the Superintendent the power to hire and fire himself (a necessary predicate under the Control Board's theory if the Superintendent is to redelegate that power to the Board of Trustees). The Control Board's labored concept is thus at war with the statute's organizational structure. The Board of Education (or the Control Board standing in the Board of Education's shoes) is at the top of the hierarchy. The Superintendent is second, and anyone receiving a subdelegation from the Superintendent is no higher than third. We therefore conclude that insofar as the Control Board exercised the Board of Education's authority, it could not have placed a third party in a position superior to the Superintendent.
 
 
 26
 There still remains the question, also raised by the Control Board, whether it can delegate its own § 207(d) authority to the Board of Trustees. This argument is premised on the notion that the Control Board has inherent delegation authority like other government agencies.[5] Why could it not, therefore, delegate to the Board of Trustees its 207(d) power to step into the shoes of the Board of Education, thus investing the Board of Trustees in one fell swoop with the order-issuing and rulemaking powers of the Board of Education? Appellants answer that this approach is also inconsistent with congressional intent. § 207(d) provides that when the Control Board exercises 207(d) powers vis-a-vis a department or agency head, it only has the power that the target official has, and, as we have seen, the Board of Education's powers to delegate are quite circumscribed. Therefore, to permit the Control Board to delegate the very 207(d) power itself to another body to step into the shoes of the Board of Education would improperly circumvent that limitation. We think there is a good deal of force to appellants' position, but we need not decide that question. Although the Control Board may have its own delegation powers[6] that could be used to subdelegate to one of its own members or staff prior to, during, or after stepping into the shoes of the Board of Education, and which differ in some ways from the delegation powers of the Board of Education, we still do not think that the Control Board can redelegate its 207(d) power to an outside body.
 
 
 27
 It would be implausible to describe the Board of Trustees in this instance as the Control Board's subdelegee. (It should be noted that Congress did provide the Control Board with an Executive Director and staff, who are hired by the Executive Director with the approval of the Control Board's chair.) While the Trustees must "report to the [Control Board]," and their powers over the appointment and removal of the Superintendent are subject to the Control Board's approval, the Trustees are clearly neither part of the "small professional staff" of the Control Board, nor the "experts or consultants" contemplated in the legislative history of the FRMAA, see H.R. REP. No. 104-96 (1995); most of their broad authority to set D.C. school policy is not even subject to the Control Board's approval.
 
 
 28
 The Control Board's power under § 207(d) to issue orders, rules, and regulations is, after all, quite extraordinary. The specific qualifications set forth in § 101(c) of the FRMAA for Control Board membership and the mechanism of Presidential appointment of the Control Board in § 101(b) indicate that Congress wanted the Control Board itself to exercise the powers of governance over the District.[7] We certainly recognize, however, that the Control Board might wish to be able to call upon others in the community to provide advice as to the Control Board's exercise of its authority over the D.C. schools. It may wish to use a body with the prestige and expertise of the Board of Trustees to fill that role, reconstituted perhaps, as an advisory board charged with recommending certain actions and policies to the Control Board.
 
 
 29
 * * *
 
 
 30
 We reject appellants' broad challenge to the Control Board's authority over the Board of Education, but we hold that those portions of the order that created and delegated to the Board of Trustees are ultra vires, and the provision permitting the Control Board to discharge the Superintendent at will is also contrary to law. Employing our remedial discretion, however, past acts of the Board of Trustees are accorded de facto validity. See Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Norton v. Shelby County, 118 U.S. 425, 440, 6 S.Ct. 1121, 1124-25, 30 L.Ed. 178 (1886). We see no benefit in plunging the District's school system into further chaos by invalidating all actions taken by the Board of Trustees over the past year. The judgment of the district court is hereby affirmed in part and reversed in part.
 
 
 
 [1]
 The Board of Trustees is made up of five members appointed by the Control Board, a parent with at least one child in the District public schools (selected by the Control Board from a list of three parents provided by the Mayor), a teacher in the District public schools (selected by the Control Board from a list of three teachers provided by the Council), the CEO-Superintendent of the public school system, and the President of the Board of Education. November Order at p 2
 
 
 [2]
 Other aspects of the FRMAA, however, greatly circumscribe the D.C. Council's power. Most notably, § 203(a) provides that all non-emergency acts passed by the Council and signed by the Mayor or passed by the Council over the Mayor's veto must be approved by the Control Board as consistent with both the District's financial plan and budget before they may be submitted to Congress in accordance with § 602(c)(3) of the Home Rule Act. § 207(c)(1) also allows the Control Board, after consultation with Congress, to implement any of its own recommendations to ensure compliance with the District's financial plan or to improve the delivery of public services over the objection of the Council
 
 
 [3]
 In a separate attack on the November Order, appellants assert that we should interpret "order, rule, or regulation" in a manner consistent with the D.C. APA. See D.C.CODE ANN.s 1-1502 (1981). But it is not apparent why the Control Board's order would not be considered an "order" as the term is defined in the D.C. APA. D.C.CODE ANN. § 1-1502(11) ("the whole or any part of the final disposition ... in any matter other than rulemaking, but including licensing"). In any event, we reject appellants' premise. The plain language of the 1996 FRMAA Amendments does not suggest that "order, rule, or regulation" should be interpreted in a technical fashion. § 5203(f) of the 1996 FRMAA Amendments, which includes § 207(d), is entitled "Granting [Control Board] Power to Issue General Orders." (Emphasis added.)
 
 
 [4]
 In contrast to this case, both Duncan and Hussey involved abridgements of statutory rights to vote, which had never been repealed by state legislatures. In Duncan, the Fifth Circuit held that officials in the State of Georgia's executive branch had usurped the voters' statutory right to fill a seat on the Georgia Supreme Court. Duncan, 657 F.2d at 708. It seems to us, however, that the question there was strictly one of state law. Hussey, on the other hand, is not really on point as it involved an equal protection challenge to a Portland city ordinance that the Ninth Circuit held impermissibly burdened a statutory right to vote on annexation granted by the Oregon state legislature. Hussey, 64 F.3d at 1262
 
 
 [5]
 Appellants point out that another provision of the Act, § 103(b), does actually give the Control Board authority to delegate the powers granted "by [that] section." (§ 103 authorizes the Control Board to obtain information, issue subpoenas, dispose of gifts, and seek judicial enforcement of its orders.) Accordingly, again appellants brandish the expressio unius maxim. But here is a perfect example of a situation where the maxim by itself is unpersuasive because there is not much reason to think that the draftsmen were considering, when they drafted § 103(b), whether or not the Control Board should have or did have authority to delegate under other sections. They may well have been focusing only on ensuring that the Control Board did have delegation authority under § 103. Since we think the negative implication is weak, so is the maxim. It helps appellants but not very much
 
 
 [6]
 The Supreme Court's cases are not one-sided as to whether an agency officer has the inherent ability to delegate his powers to subordinates. Compare Cudahy Packing Co. of La. v. Holland, 315 U.S. 357, 366, 62 S.Ct. 651, 656, 86 L.Ed. 895 (1942) (concluding Congress intended "that the subpoena power shall be delegable only when an authority to delegate is expressly granted"), with Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947). We often have upheld an agency head's ability to delegate duties to subordinate officers, see, e.g., SEC v. Arthur Young & Co., 584 F.2d 1018, 1027-28 (D.C.Cir.1978) (allowing delegation of subpoena power to SEC staff), but these cases do not involve delegations of agency authority to outside parties
 
 
 [7]
 In this context there is no need to be concerned about administrative efficiency, cf. Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. at 123, 67 S.Ct. at 1135 (Jackson, J., concurring); SEC v. Arthur Young & Co., 584 F.2d at 1026, because of the Board of Education's and thus the Control Board's authority to delegate to the Superintendent, as well as the Control Board's ability to utilize its own Executive Director