OPINION
{¶ 1} Plaintiffs-appellants Barnesville Education Association OEA/NEA, et al. appeal the decision of the Belmont County Common Pleas Court which dismissed the Association's request for declaratory relief for failure to state a claim upon which relief can be granted and dismissed its request to vacate an arbitrator's award. The issues in this case revolve around Ohio statutes requiring a commission to oversee the finances of a school district declared to be in a state of fiscal emergency. Appellants claim the statutes' application herein violates the Contracts Clause and the Equal Protection Clause of the Ohio Constitution. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF FACTS {¶ 2} In June 2003, State Auditor Betty Montgomery issued a fiscal caution to the Barnesville School District and its Board of Education under R.C. 3316.031. On December 18, 2003, the Auditor declared the School District to be in a state of fiscal emergency under R.C.3316.03(B). An audit established that more than 1.5 million dollars needed to be eliminated from the Board of Education's budget. As a result of the declaration of a fiscal emergency, a five-member Financial Planning and Supervision Commission was appointed by various state and local officials as required under R.C. 3315.05.
 {¶ 3} The Commission's function is to rehabilitate the district's finances by supervising the Board of Education's fiscal affairs. Pursuant to R.C. 3316.07(A)(11), the Commission has the power to reduce the School District's workforce despite provisions to the contrary in any collective bargaining agreement entered into on or after November 21, 1997. Using this authority, on April 7, 2004, the Commission passed a resolution directing the Board of Education to suspend eighteen teaching contracts.
 {¶ 4} The teachers through their union, the Barnesville Education Association OEA/NEA, had an existing collective bargaining agreement with the Board of Education dated July 2001. Pursuant to Article 32.1 of that agreement, the Board can only reduce the workforce for certain enumerated reasons, none of which are financial reasons. Thus, the Association filed a grievance against the Board of Education *Page 4 
alleging that Article 32.1 was violated when the Board of Education reduced the workforce for financial reasons. On May 23, 2005, an arbitrator denied the grievance finding that the reduction was not solely the act of the Board of Education but was required by the Commission pursuant to Chapter 3316 of the Ohio Revised Code.
 {¶ 5} On May 25, 2005, the Association along with terminated teacher Amanda Bradfield and district resident Christopher Pack [hereinafter collectively referred to as appellants] filed a complaint against the Board of Education, the Commission, the Auditor and the State Superintendent of Public Instruction for the Ohio Department of Education, Susan Tave Zelman. The final version of their complaint is contained in their October 12, 2005 second amended complaint. Appellant sought declaratory and injunctive relief and filed an accompanying motion to vacate the arbitrator's award.
 {¶ 6} The declaratory action sought a judgment that Chapter 3316 of the Revised Code is unconstitutional under the Contracts Clause of the Ohio Constitution because it required an action in contravention of the 2001 collective bargaining agreement (which they labeled an extension of a 1998 agreement which was an extension of a 1995 agreement). They also contended that Chapter 3316 violated the Equal Protection Clause of the Ohio Constitution because voters in a fiscally distraught district are deprived of their elected board of education and forced to accept an appointed de facto board while voters in fiscally sound school districts are not. Appellants attached to the complaint the 2001, 1998 and 1995 collective bargaining agreements, the Commission's April 2004 recovery plan for the district and the arbitrator's decision.
 {¶ 7} On October 12, 2005, the Auditor filed a motion to dismiss under Civ.R. 12(B)(1) and (6) alleging a failure to state a claim, a lack of standing and lack of subject matter jurisdiction. The Auditor argued there was no actual controversy between the Auditor and appellants as is required for a declaratory action. The Auditor also claimed that appellants failed to take issue with any action of the Auditor or seek any relief from her.
 {¶ 8} On November 7, 2005, the Commission, the State Superintendent and the Board of Education filed a motion to dismiss under Civ.R. 12(B)(6) for failure to *Page 5 
state a claim upon which relief could be granted. They urged that the Equal Protection Clause is not violated because Chapter 3316 does not infringe on the right to vote for candidates for the Board of Education and that any classification is constitutional because the legislature had a rational basis for enacting the statutes at issue. They then argued that the Contracts Clause was not violated as it only protects against statutes that retrospectively affect contractual rights, but the collective bargaining agreement here was executed in 2001, which is after the 1997 enactment of R.C. 3316.07(A)(11). Responses and replies were then filed.
 {¶ 9} On May 22, 2006, the trial court dismissed appellants' claims against all parties under Civ.R. 12(B)(6) for failure to state a claim upon which relief may be granted. The court found that R.C.3316.07(A)(11) superseded the agreement and concluded that the legislature provided a rational basis for treating financially distressed school districts differently. The court also overruled the motion to vacate the decision of the arbitrator since the arbitrator properly applied the statutory mandate of Chapter 3316 of the Revised Code.
 {¶ 10} Appellants filed timely notice of appeal. The Board of Education, the Commission and the Superintendent filed a joint brief as appellees. The Auditor filed her own brief, which mainly contests the propriety of joining her in the action. The Auditor's separate contentions will be discussed at the end of the opinion.
 STANDARD OF REVIEW {¶ 11} A dismissal for failure to state a claim upon which relief can be granted under Civ.R. 12(B)(6) is subject to de novo review.Perrysburg Twp. v. Rossford, 103 Ohio St.3d 79, 2004-Ohio-4362, ¶ 5. The court can consider the complaint and any documents attached to or incorporated into the complaint in ruling on the motion. See State exrel. Crabtree v. Franklin Cty. Bd. of Health (1997), 77 Ohio St.3d 247,248, 249, fn. 1.
 {¶ 12} In order to uphold the dismissal, it must appear beyond doubt that the plaintiff can prove no set of facts entitling him to relief.Maitland v. Ford Motor Co., 103 Ohio St.3d 463, 2004-Ohio-5717, ¶ 11. In making this evaluation, the court accepts all material factual allegations in the complaint as true and construes all inferences that may be reasonably drawn therefrom in favor of the plaintiff. Id. *Page 6 
 {¶ 13} However, unsupported conclusions of a complaint are not taken as true and are not sufficient to withstand a motion to dismiss.State ex rel. Hickman v. Capots (1989), 45 Ohio St.3d 324. Thus, even if couched as factual allegations, legal conclusions are not taken as true. See, e.g., Phung v. Waste Management, Inc. (1986), 23 Ohio St.3d 100,102 (accept factual contentions); Connell v. Wayne Builders Corp. (Jan. 30, 1996), 10th Dist. No. 95APE07-897 ("less any legal conclusions").
 {¶ 14} Moreover, regarding claims of an unconstitutional statute, it is well settled that statutes enjoy a strong presumption of constitutionality. State v. Collier (1991), 62 Ohio St.3d 267, 269. The party attacking the statute must establish that it is unconstitutional beyond a reasonable doubt. State ex rel. Richard v. Bd. of Trustees ofPolice Firemen's Disability Pension Fund (1994), 69 Ohio St.3d 409,413.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 15} Appellants' first assignment of error contends:
 {¶ 16} "THE TRIAL COURT FAILED TO APPLY THE PROPER STANDARD IN DECIDING APPELLEE'S MOTIONS TO DISMISS."
 {¶ 17} Initially, we reiterate that we are conducting a de novo review. Perrysburg Twp., 103 Ohio St.3d 79 at ¶ 5. Thus, the reasons behind the trial court's decision are technically irrelevant for our appellate review purposes. This assignment of error briefly argues that the trial court weighed factual allegations rather than simply construing the factual allegations as true. We shall briefly address these arguments; although, they are both irrelevant due to the de novo review and moot as will be shown in addressing the merits of subsequent assignments of error.
 {¶ 18} Appellants quote three sentences from the trial court's judgment entry in support of their argument here. The first two quoted sentences contain the trial court's conclusion that the Board of Education's actions and decisions caused the creation of the Commission. See J.E. p. 3-4. The court used this conclusion to support its ultimate conclusion that the Board of Education was not eliminated from the school district's government.
 {¶ 19} Contrary to appellants' contention, the conclusion that the way the Board handled its finances (whether handled right or wrong under the Board's monetary *Page 7 
constraints) technically caused the creation of the Commission does not improperly weigh the evidence. Rather, it is a legal conclusion. That is, after construing as true the factual allegations of appellants' complaint and the contents of the attachments to the complaint, the trial court's conclusion is a technically correct legal characterization of the statutorily expressed impetus for the creation of commissions in financially distressed school districts. This will be touched on further below when delving into the effects and purposes of the pertinent statutes.
 {¶ 20} The final excerpt from the trial court's holding, which appellants categorize as an improper weighing of evidence, is italicized within the following paragraph set forth to provide context:
 {¶ 21} "The General Assembly has provided a rational basis fortreating financially distressed school districts differently from otherdistricts. That basis consists of a need to preserve the fiscal integrity of school districts. The fiscal commission must consult with a local school board and community about its decision and must return fiscal control to the board when the district is restored to fiscal health. Thus, the power granted to the commission is not so broad as to exceed the rational purpose for which it was created." See J.E. p 4.
 {¶ 22} Contrary to appellants' belief, this is not an adoption of the arguments of the parties seeking dismissal. Rather, it is a reference to the legislature's statutorily expressed policy and purposes for enacting the disputed statutes. The General Assembly has explicitly declared the following public purpose and legislative intent:
 {¶ 23} "(A) Pursuant to the authority of the general assembly to provide for the public health, safety, and welfare, it is hereby declared to be the public policy and a public purpose of the state to require fiscal integrity of school districts so that they can educate children, pay when due principal and interest on their debt obligations, meet financial obligations to their employees, vendors, and suppliers, and provide for proper financial accounting procedures, budgeting, and taxing practices. The failure of a school district to so act is hereby determined to affect adversely the health, safety, and welfare not only of the people of the school district but also of other people of the state. *Page 8 
 {¶ 24} "(B) The intention of the general assembly, under this chapter, is to enact procedures, provide powers, and impose restrictions to assure fiscal integrity of school districts as set out in division (A) of this section." R.C. 3116.02.
 {¶ 25} Thus, the court's statement was an evaluation of the relevant law on the topic. It was not the acceptance of one parties' factual allegations over another's. The propriety of this legal conclusion that the legislature provided a rational basis is discussed in full below. This assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 26} Appellants' second assignment of error provides:
 {¶ 27} "THE TRIAL COURT ERRED IN DISMISSING APPELLANTS' EQUAL PROTECTION CLAIM."
 {¶ 28} Initially, appellants complain that the court used a due process rather than an equal protection analysis and failed to distinguish their argument about voters (rather than districts) being treated differently. Such contentions are irrelevant since this court conducts a de novo review. Moreover, although the trial court did uphold the statutes' constitutionality under the Due Process Clause, the court also employed an equal protection analysis. For instance, the court found the legislature had a rational basis for treating financially distressed districts differently from other districts. Whether a rational basis is the proper test is one of the ultimate issues discussed next.
 {¶ 29} The Equal Protection Clauses contained in theFourteenth Amendment to the United States Constitution and in Section 2, Article I
of the Ohio Constitution are functional equivalents. DeSenco, Inc. v.Akron (1999), 84 Ohio St.3d 535, 544. These provisions only require the disputed classification to rationally further a legitimate state interest unless the classification jeopardizes the exercise of a fundamental right or is based upon a suspect class. Id. If there is an abridgement of a fundamental right or utilization of a suspect class, then the strict scrutiny test, instead of the rational basis test, applies. Sorrell v. Thevenir (1994) 69 Ohio St.3d 415, 424.
 {¶ 30} Appellants urge that a fundamental right was violated and thus strict scrutiny is the applicable test. Appellants begin by noting that the right to vote is a fundamental right. See DeSenco,84 Ohio St.3d at 544. Then, appellants point out that the right to elect a school board has been granted to the voters in this state. See *Page 9 
R.C. 3313.01. Thus, they conclude that once the legislature grants voters the right to elect a school board, it cannot pass legislation infringing on the powers of the elected board without implicating fundamental rights.
 {¶ 31} Generally, appellants rely on precedent holding that once the state decides to fill an office by popular election, the Equal Protection Clause requires that each qualified voter must be given an equal opportunity to participate in the election. See Hadley v. JuniorCollege Dist. of Kansas City (1970), 397 U.S. 50, 56. Appellants connect this holding to one stating that the right to vote can be denied by either physically disallowing the right to cast a ballot or by dilution or debasement of the effect of the vote. See Reynolds v. Simms (1964),377 U.S. 533, 535. Appellants continue that the statutes creating the Commission here debase the right to vote by appointing an unelected commission to exercise authority of a board for whom the voters have cast their ballots. Appellants conclude that the voters in this school district are thus denied a fundamental right, requiring the distinction between districts to be subjected to a strict scrutiny analysis.
 {¶ 32} Specifically, appellants offer a case review of a decision they allege is a case on point. Tully v. Edgar (Ill. 1996), 171 Ill. 2d 297, 215 Ill. Dec. 646, 664 N.E.2d 43. In that case, a voter challenged an act that replaced the elected board of trustees of a university with an appointed board in the middle of the trustees' term. The Illinois Supreme Court held that legislation that nullifies the voters' election results by eliminating the right of the elected board to serve implicates the fundamental right to vote. Id. Thus, strict scrutiny was applied. Id. Appellants similarly conclude that the legislation at issue herein nullified the voters' choice by redirecting authority the voters gave the Board of Education to the Commission.
 {¶ 33} Appellees respond that there is no fundamental right implicated by the creation of a commission to oversee the financial responsibilities of a board of education whose school district is in a state of fiscal emergency. Appellees state that the right here is not a fundamental right because there is no right to an elected school board. They then cite cases holding that school board membership can constitutionally be constructed by appointments rather than elections. See, e.g., Sailors v. Board of Educ. (1967), 387 U.S. 105. *Page 10 
 {¶ 34} Alternatively, appellees state that even if there is a fundamental right to vote for the board of education since it has been statutorily granted, the statutes creating a commission to oversee the finances of a fiscally distraught district do not deprive voters of the ability to elect board members. Appellees distinguish the Tully case appellants cite, noting that the board members here were not ousted and remain as board members with full functions in all areas with the exception of financial decision-making. And, even in that area, the Board has input as well as the future right to take over once the emergency is abated. Thus, appellees conclude there was no deprivation of any fundamental right to vote.
 {¶ 35} Appellees rely on what they consider a case on point out of a Federal Circuit Court. Shook v. District of Columbia Fin. Resp. Mgmt.Assist. Auth. (C.A.D.C. 1998), 132 F.3d 775, 781. In that case, Congress passed legislation creating an appointed authority to deal with financial problems in the District of Columbia's school district thereby transferring many powers and duties of the elected board of education to the appointed authority. Various residents filed suit alleging that the legislation impermissibly interfered with their voting rights. Both the trial court and appellate court rejected their claims. It was held that drastically reducing the power of the board of education does not raise an independent constitutional issue.
 {¶ 36} Appellants attempt to distinguish Shook on the ground that the Equal Protection Clause was not at issue; rather, the court was evaluating the Due Process Clause. Since there was only one school district in Washington D.C., Equal Protection arguments on classifications could not have been raised. However, an analysis of alleged Due Process Clause violations also entails the consideration of any fundamental rights in order to determine whether the strict scrutiny test applies. See Reno v. Flores (1993), 507 U.S. 292, 305;Sorrell, 69 Ohio St.3d at 423. As such, the Shook Court was still evaluating the issue in the fundamental rights context. Thus, appellants attempt to distinguish Shook on this basis fails. Still, just as appellants' Tully case is merely persuasive authority, so is appellees'Shook case.
 {¶ 37} No one disputes that there is a fundamental right to vote. SeeDeSenco, 84 Ohio St.3d at 544. However, "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." Bullock v. Carter *Page 11 
(1972), 405 U.S. 134. As will be established, diminishing the powers of an elected board of education due to a fiscal emergency does not violate the fundamental right to vote.
 {¶ 38} Appellants' reliance on Reynolds to support its extension of the right to vote is misplaced. Reynolds spoke of debasement or dilutionof the weight of a citizen's vote on a matter in comparison to the weight of another citizen's vote, not alleged dilution through weakening the strength of a particular entity. Reynolds, 377 U.S. at 555, 568. In that case, the weight of the vote was found to be diluted for some citizens due to a failure to reapportion districts as required. Id. at 557. The Court's dilution analysis focused on voting power, majority rule and the doctrine of one man/one vote, proclaiming that a man's vote in a rural area should not be worth ten times a man's vote in an urban area. Id. at 562-563. These doctrines have nothing to do with the situation before us. Moreover, the Reynolds Court also limited its holding to statewide elections where all voters are voting for the same candidate or issue. Id. at 560. Here, the different classes of voters raised by appellants are voting on different candidates on different boards in local elections.
 {¶ 39} The Tully case cited by appellants is also distinguishable because that board was totally eliminated mid-term. Here, the Board of Education still exists, still has functions besides financial dealings, has some input in the Commission's financial decisions and will have its financial powers restored eventually. Regardless, Tully is not binding on this court. Although appellees' Shook case is not binding either, its holding is more of a case on point. As aforestated, the Federal Circuit Court for the District of Columbia concluded that the fundamental right to vote was not implicated where the legislature drastically reduced the elected board of education's power and transferred that power to an appointed board.
 {¶ 40} As the United States Supreme Court has held, there is no constitutional right to an elected school board. Sailors,387 U.S. at 108. Thus, the legislature can provide for filling a school board by election, appointment or a combination of election and appointment. Id. (rejecting equal protection arguments where Michigan allowed appointed county board to restructure elected school board's affairs). *Page 12 
 {¶ 41} It is true that merely because the board could have been filled by appointment does not mean that the right to vote can be violated where a board is filled by election. Kramer v. Union Free Sch.Dist. (1969), 395 U.S. 621, 627-628. However, this does not lead to the conclusion that the right to vote is violated when a state legislatively removes certain financial powers from an elected board that remains functional in a fiscal emergency. The school board only has powers as granted by the legislature. State ex rel. Ohio Cong. of Parents Teachers v. State Bd. of Edn., 111 Ohio St.3d 568, 2006-Ohio-5512, ¶ 47
(rejecting argument that charter school constitutionally interferes with city school boards power and also holding that Section 3 of Article IV of Ohio's Constitution governs questions of size and organization, not the power and authority, of city school boards). Once statutorily granted, these powers are not forever fixed and immutable.
 {¶ 42} To the contrary, the right to have an elected board member retain every power over finances that such member had when he was elected is not a fundamental right of a voter in a school district. As aforementioned, a classification does not automatically involve the fundamental right to vote merely because it affects a matter that can be traced back or connected to an original vote. See, also,Denseco, 84 Ohio St.3d at 544 (finding that classifications denying the right to vote on income tax issues to those who merely work in a city do not implicate the fundamental right to vote).
 {¶ 43} In fact, there is another reason not mentioned by the parties that the right to vote is not impinged. In this case, the board members could not have had an absolute future right of decision-making over finances at the time they took office or at the time the voters placed their ballots. That is, board members are only elected for four-year terms. See R.C. 3313.09. The statutes on fiscal emergency relevant herein were enacted in 1996 and 1997 and were not applied to this school district until 2004. Thus, any board members whose financial powers were temporarily replaced by the Commission were elected after the statute gave them and the voters notice that an appointed Commission could supplant certain board functions in a fiscal emergency. Thus, the voters cast their ballots in all districts knowing that if their district is no longer similarly situated as other districts based upon extreme financial distress as a result of the elected board's financial management, then an appointed commission will be *Page 13 
created to remedy the financial situation. As such, the right to vote was not inappropriately diluted as alleged by appellants.
 {¶ 44} In conclusion, the fundamental right to vote is not implicated by statutes that create an appointed commission to oversee an elected board of education's finances in a fiscally distressed district. Hence, any claimed classification of voters in different school districts is subject only to a rational basis review. We thus proceed to such review.
 {¶ 45} Contrary to appellants' suggestions, whether there is a rational basis for a statute attacked as unconstitutional can be determined affirmatively in a motion to dismiss for failure to state a claim. See, e.g., DeSenco, 84 Ohio St.3d at 544 (disposing of equal protection claim on fundamental right to vote in a motion to dismiss);Fahnbulleh v. Strahan (1995), 73 Ohio St.3d 666, 668 (upholding dismissal finding statute reasonably calculated to advance legitimate government interests and concluding there was no equal protection violation).[1] Thus, we can proceed to evaluate whether the legislature has a rational basis for treating school districts differently where they are financially distressed.
 {¶ 46} The rational basis test provides that a statute shall be held constitutional "if it bears a rational relationship to a legitimate governmental interest." State v. Peoples, 102 Ohio St.3d 460,2004-Ohio-3923, ¶ 7. The classifications being evaluated are only invalid if they bear no reasonable relation to the state's goals and if no ground can be conceived to justify them. Id. See, also, Heller v.Doe (1993), 509 U.S. 312, 320 (the challenger has the heavy burden of negating every conceivable basis before an equal protection challenge will be upheld). "In areas of social and economic policy, [a classification] must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Federal Communications Comm. v.Beach Communications, Inc. (1993), 508 U.S. 307, 313. *Page 14 
 {¶ 47} The fiscal emergency statutes here bear a rational relationship to various legitimate governmental purposes. For instance, by allowing an appointed commission to lead the district out of debt, the state is experimenting with devices which may be implemented in the future for all school districts to avoid financial distress in the first place. The appointed commission also removes political pressure from financial decision-making. Moreover, the threat of a commission's appointment provides incentive for a marginally solvent district to improve their own finances. Additionally, school finances are important to the proper education of the state's children, which is a compelling state interest. Finally, we point to the legislature's own statutorily expressed interests and purposes:
 {¶ 48} "(A) Pursuant to the authority of the general assembly to provide for the public health, safety, and welfare, it is hereby declared to be the public policy and a public purpose of the state to require fiscal integrity of school districts so that they can educate children, pay when due principal and interest on their debt obligations, meet financial obligations to their employees, vendors, and suppliers, and provide for proper financial accounting procedures, budgeting, and taxing practices. The failure of a school district to so act is hereby determined to affect adversely the health, safety, and welfare not only of the people of the school district but also of other people of the state.
 {¶ 49} "(B) The intention of the general assembly, under this chapter, is to enact procedures, provide powers, and impose restrictions to assure fiscal integrity of school districts as set out in division (A) of this section." R.C. 3116.02.
 {¶ 50} In considering these reasons, it is clear there is a rational basis for enacting the fiscal emergency statutes.[2] For all of the foregoing reasons, the motion to dismiss was properly granted as to appellants' Equal Protection claims. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 51} Appellants' third assignment of error contends: *Page 15 
 {¶ 52} "THE TRIAL COURT ERRED IN DISMISSING APPELLANTS' IMPAIRMENT OF CONTRACTS CLAIM."
 {¶ 53} Pursuant to R.C. 3316.07(A)(11), the appointed Commission has the power to make reductions in the workforce to balance the district's budget regardless of any provisions to the contrary in a collective bargaining agreement entered into on or after November 21, 1997. Appellants argue that this statutory provision impairs their contractual rights in their collective bargaining agreement, which essentially disallows a reduction in the workforce due to financial reasons. Because they conclude that their contractual obligations were impaired, appellants proceed to analyze whether the impairment is of constitutional magnitude. Appellants urge that the usual rational basis test does not apply to the impairment because the legislation is self-serving for the financial benefit of the state or its subdivision; thus, they conclude that the law must be reasonable and necessary to serve an important public purpose.
 {¶ 54} The Contract Clause prohibits the legislature from "impairing the obligation of contracts * * *." Section 28 of Article II of the Ohio Constitution. This provision is coextensive with that in the Federal Constitution. Westfield Ins. Co. v. Galatis, 100 Ohio St.3d 216,2003-Ohio-5849, ¶ 10. In order to claim the legislation impaired the obligation of contracts, the claimant must allege impairment of an existing contract by a subsequent law. State ex rel. City of Youngstownv. Jones (1939), 136 Ohio St. 130, 136. Contracts entered into on or after the effective date of the disputed statute are not impaired and are thus not entitled to the protection of the Contract Clause.Aetna Life Ins. Co. v. Shilling (1993), 64 Ohio St.3d 168.
 {¶ 55} Here, the relevant statutes were enacted in 1996 with a pertinent 1997 amendment. As quoted above, the amended provision concerning the reduction of the workforce pertains specifically only to those collective bargaining agreements entered into on or after November 21, 1997. The collective bargaining agreement relied upon here for its reduction in workforce provision was not entered into until 2001. Thus, R.C. 3316.07(A)(11) did not impair obligations under an existing contract.
 {¶ 56} Appellants thus attempt to create a contract pre-existing the law by tracing the 2001 collective bargaining agreement back to a 1998 agreement and in *Page 16 
turn tracing the 1998 agreement back to a 1995 agreement in order to predate the statute. In support, they rely on section 1.3 of the agreements, which provides:
 {¶ 57} "These negotiations are entered into between the Board and the Association for the purpose of establishing and setting forth, in writing, matters pertaining to wages, hours, terms and other conditions of employment, and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement."
 {¶ 58} They conclude that this section means that the 2001 agreement did not create rights but merely continued rights that were created as early as 1995.
 {¶ 59} However, as appellees point out, all of the contracts in this case specifically state that they are only effective for three years. Specific provisions prevail over more general provisions. Salem CitySch. Dist. Bd. Of Edn. v. Ultra Builders, Inc. (Jan. 29, 1993), 7th Dist. No. 92C48, citing Gibbons-Grable Co. v. Gilbane Building Co.
(1986), 34 Ohio App.3d 170. Moreover, section 1.3 does not provide for a perpetual contract or perpetual contractual rights that can never be affected by legislation, but it merely notes the scope of negotiation for further contracts.
 {¶ 60} As appellees point out, the parties' extension of contractual rights in a new contract does not affect the expiration date of the prior contract for purposes of the Contract Clause. In fact, R.C.4117.09(E), referring to collective bargaining agreements of public employees, expressly provides:
 {¶ 61} "No agreement shall contain an expiration date that is later than three years from the date of execution. The parties may extend any agreement, but the extensions do not affect the expiration date of the original agreement."
 {¶ 62} For all of these reasons, a statute effective in 1996 and a statutory provision effective in 1997 do not act to impair existing contractual obligations where those laws were applied to impair obligations granted under an agreement that was not executed until 2001. The Contract Clause is not implicated, and we thus need not analyze the public purpose or propriety of the method for attaining that purpose under any test set forth by appellants. This assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 63} Appellants' fourth and final assignment of error provides: *Page 17 
 {¶ 64} "THE TRIAL COURT ERRED IN DISMISSING APPELLANTS' CLAIM SEEKING TO VACATE THE ARBITRATOR'S DECISION."
 {¶ 65} In this assignment of error, appellants rely on the arguments set forth under their second assignment of error concerning the constitutionality of the fiscal emergency statutes. Because the disputed statutes are constitutional, the arbitrator could not have ordered the Board to reinstate the suspended teachers. Thus, the arbitrator neither exceeded the scope of his power nor acted contrary to public policy. This assignment of error is overruled. Accordingly, the trial court's judgment dismissing the case is affirmed.
 AUDITOR'S ARGUMENTS {¶ 66} As aforementioned, the Auditor filed a separate brief with distinct arguments regarding the propriety of involving her in this action. The Auditor states that none of her actions are being disputed and no relief is requested of her. She believes that this means there is no subject matter jurisdiction over her and no standing to sue her. Because she believes there is no controversy between her office and appellants, the Auditor concludes that declaratory relief cannot be sought against her.
 {¶ 67} To the contrary, appellants direct us to R.C. 2721.12(A), which provides in pertinent part:
 {¶ 68} "* * * when declaratory relief is sought under this chapter in an action or proceeding, all persons who have or claim any interest that would be affected by the declaration shall be made parties to the action or proceeding."
 {¶ 69} Appellants conclude that the declaratory relief they seek involves declaring some of the Auditor's powers unconstitutional. As such, they believe her interests would be affected by the declaration they seek. They quote:
 {¶ 70} "Properly, when declaratory relief is sought which involves the validity or construction of a statute and affects the powers and duties of public officers, such officers should be made parties to the action or proceeding in which the relief is sought." City of Cincinnati v.Whitman (1975), 44 Ohio St.2d 58, 61 (Director of Environmental Protection Agency must be made party to declaratory action attacking constitutionality of fluoridated water statute). *Page 18 
 {¶ 71} The Auditor responds that the case before us is distinguishable from Whitman because the other government agencies sued will adequately protect the public interests. However, this does not explain why the Auditor is not a proper party when appellants seek to declare unconstitutional the statutes that grant the Auditor power to perform various functions. We conclude that Whitman permits appellants to name the Auditor as a party since her powers and duties would be affected.
 {¶ 72} The Auditor also contends that appellants have no standing because under R.C. 3116.03(E), only the board of education can contest the declaration of a fiscal emergency. However, as appellants point out, they are not contesting that the school district is in a fiscal emergency. Rather, they are contesting the constitutionality of the statutory scheme. Thus, the Auditor's arguments are without merit.
 {¶ 73} Regardless, as set forth supra, the trial court's decision dismissing the action was correct as the statutes at issue are not unconstitutional.
 {¶ 74} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
DeGenaro, P.J., concurs. Waite, J., concurs.
[1] We also note that, contrary to appellants' argument, even if strict scrutiny applied, such issue can be evaluated pursuant to a motion to dismiss, especially in cases where the legislative interests are enacted along with the law. See Arnold v. Cleveland (1993),67 Ohio St.3d 35, 36, 46, 49 (holding on the pleading alone that appellant could prove no set of facts entitling them to relief after considering city's rationale and interests as expressed in an assault weapon ordinance).
[2] In fact, these reasons supply a compelling government interest narrowly tailored to meet the objective, as required if strict scrutiny were the applicable test in the case of infringement on a fundamental right. *Page 1